657 A.2d 330

**KENT VILLAGE ASSOCIATES JOINT VENTURE, et al.**

v.

**Kimberly SMITH, a Minor, etc., et al.**

**No. 413, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Decided April 26, 1995.

508

510

Jeffrey R. Schmieler (Steven B. Vinick and Saunders and Schmieler, on the brief) Silver Spring, for appellants.

Geoffrey S. Gavett, Rockville (Rhoda S. Barish and Gavett and Datt, P.C., Rockville, Stewart C. Economou, J. Casey Forrester, Ronald A. Ray and Economou and Forrester, Alexandria, VA, on the brief), for appellees.

Argued before WILNER, C.J., and MOYLAN and CATHELL, JJ.

WILNER, Chief Judge.

This appeal arises from a tragic accident that occurred on October 27, 1988. Four-year-old Kimberly Smith was playing on a refuse bin located near the playground in the apartment development where she lived when the bin fell over on her, causing very serious and permanent injuries and leaving her a paraplegic.

In April, 1991, the State of Illinois, Kimberly's guardian, filed suit in the Circuit Court for Prince George's County against Kent Village Associates Joint Venture (Kent Village), the owner of the apartment development; Southern Management Corp. (Southern), an allied company, which acted as management agent for Kent Village; and Consolidated Waste Industries, Inc. (Consolidated), which provided waste removal services for Kent Village and which owned the refuse bin. Two causes of action were submitted to a jury—negligence and violation of Federal Consumer Product Safety Act (15 U.S.C. § 2051 et seq.). The jury (1) found against all three defendants on both counts, (2) assessed damages against each in the amount of $14,640,000, and (3) determined that Kent Village and Southern were not entitled to indemnification from Consolidated. Upon motion of the defendants, the court applied the provisions of Md.Code Cts. & Jud.Proc. art., § 11–108 and reduced the $2,300,000 component of the verdict awarded for non-economic damages to $350,000, thus reducing the aggregate verdict to $12,690,002.

Kent Village and Southern have appealed the judgments entered against them and the subsequent refusal of the court to "annuitize" the judgment in accordance with Md.Code Cts. & Jud.Proc. art., § 11–109. Kimberly has cross-appealed the $1,950,000 reduction in the jury's verdict. Consolidated has not appealed. Five issues are presented by Kent Village and Southern:

(1) Whether there was legally sufficient evidence that they knowingly violated the Consumer Product Safety Act, and that any such violation was the proximate cause of the accident;

(2) Whether the court erred in allowing into evidence and the jury to consider certain standards promulgated by the American National Standards Institute (ANSI);

(3) Whether the court erred in allowing a life care planner, Estelle Davis, to render opinions concerning Kimberly's future medical condition and treatment;

(4) Whether the court misinterpreted Md.Code Cts. & Jud.Proc. art., § 11–109 in refusing to approve appellants' proposed "annuitization" of Kimberly's future medical expenses; and

(5) Whether the court erred in entering judgment for Consolidated on appellants' cross-claim for contribution.

In her cross-appeal, Kimberly raises the single issue of whether Federal preemption precludes the application of Maryland's statutory $350,000 "cap" on non-economic damages to an award based on a violation of the Consumer Product Safety Act.

We shall deal with these issues in the order presented.

### CONSUMER PRODUCT SAFETY ACT

The Consumer Product Safety Act is found in 15 U.S.C. §§ 2051–2083. One of its purposes, enunciated by Congress in § 2051(b), is to protect the public against unreasonable risks of injury associated with consumer products. A "consumer product" is defined in § 2052(a) as including a product produced or distributed for sale to a consumer for use in or

around a residence. Appellants do not dispute that the refuse bin that crushed Kimberly Smith was a consumer product.

The Act creates the Consumer Product Safety Commission and authorizes it, among other things, to promulgate consumer product safety standards and rules declaring a product that is distributed in commerce and presents an unreasonable risk of injury to be a "banned hazardous product." §§ 2056, 2057. On June 13, 1978, the Commission adopted a rule declaring as banned hazardous products certain refuse bins of metal construction, having an actual internal volume of one cubic yard or greater, which tip over when subjected to a horizontal force of 70 pounds or a vertical downward force of 191 pounds. 16 C.F.R. Part 1301.

Section 2068(a)(2) of title 15 makes it unlawful for any person to distribute in commerce a banned hazardous product. Sections 2069, 2070, and 2071 provide civil and criminal penalties for the violation of § 2068 and for injunctive relief. Section 2072(a) provides, additionally, in relevant part:

"Any person who shall sustain injury by reason of any knowing (including willful) violation of a consumer product safety rule, or any other rule or order issued by the Commission may sue any person who knowingly (including willfully) violated any such rule or order in any district court of the United States in the district in which the defendant resides or is found ..., shall recover damages sustained, and may, if the court determines it to be in the interest of justice, recover the costs of suit, including reasonable attorneys' fees ... and reasonable expert witness' fees...."

The basis of Kimberly's claim under the Consumer Product Safety Act was the contention that (1) until February, 1986, Kent Village and Southern performed the waste removal services for the Kent Village complex, (2) Kent Village then owned the bin that fell over on her, (3) in February, 1986, the bin was a banned hazardous product, (4) in that month, Kent Village or Southern contracted with Consolidated to perform the waste removal services for the apartment complex and, as part of that contract, sold Consolidated the bins Kent Vil-

lage/Southern were then using, including the bin that injured Kimberly, and (5) through that sale, Kent Village/Southern distributed a banned hazardous product in commerce.

Kent Village and Southern offer a two-part defense to this claim: first, that State courts have no jurisdiction over claims made under the Consumer Product Safety Act; and second, that the evidence was insufficient to show that the bin that fell on Kimberly was a banned hazardous product. We find no merit in either assertion.

## Jurisdiction

As noted, § 2072(a) allows a person injured by reason of any knowing violation of a rule or order of the Commission to sue the violator "in any district court of the United States in the district in which the defendant is found. . . ." Appellants treat this statute as conferring exclusive jurisdiction on the Federal courts and thus precluding such suits in State courts.

The principles governing this issue were well and succinctly stated in *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981), where the Court found concurrent State jurisdiction over actions under the Outer Continental Shelf Lands Act. There, as here, the Federal District Courts were given express jurisdiction over claims arising under the Act, but the Court, at 479, 101 S.Ct. at 2875, made clear that "the mere grant of jurisdiction to a federal court does not operate to oust a state court from concurrent jurisdiction over the cause of action." Earlier in the Opinion, the Court declared:

"The general principle of state-court jurisdiction over cases arising under federal laws is straightforward; state courts may assume subject-matter jurisdiction over a federal cause of action absent provision by Congress to the contrary or disabling incompatibility between the federal claim and state-court adjudication. . . .

In considering the propriety of state-court jurisdiction over any particular federal claim, the Court begins with the presumption that state courts enjoy concurrent jurisdic-

tion.... Congress, however, may confine jurisdiction to the federal courts either explicitly or implicitly. Thus, the presumption of concurrent jurisdiction can be rebutted by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests."

*Id.* at 477–78, 101 S.Ct. at 2875 (citations omitted); *see also Tafflin v. Levitt,* 493 U.S. 455, 458–60, 110 S.Ct. 792, 794–95, 107 L.Ed.2d 887 (1990), recognizing concurrent State court jurisdiction over civil RICO claims.

Applying these principles, the Supreme Court of Minnesota, after reviewing the legislative history of the Consumer Product Safety Act, held that the State courts had concurrent jurisdiction over claims under § 2072. *Swenson v. Emerson Elec. Co.,* 374 N.W.2d 690 (Minn.1985), *cert. denied,* 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986). At 697, the Court reasoned:

> "Section 2072 contains no explicit grant of exclusive jurisdiction to the federal courts. Our review of the legislative history of the CPSA does not reveal any consideration of the jurisdictional question.... Finally, it is unlikely that Congress intended federal courts to have exclusive jurisdiction over private actions under the CPSA because most actions in which CPSA claims are asserted would also include claims of state common law violations such as negligence, breach of warranty, and strict product liability. Any intent by Congress to require all of these actions to be brought in federal courts would have to be explicit."

(Citations omitted.) The New York courts have reached a similar conclusion. *See Howard v. Poseidon Pools, Inc.,* 133 Misc.2d 43, 506 N.Y.S.2d 519 (1986), *aff'd in part, rev'd in part on other grounds,* 134 A.D.2d 926, 522 N.Y.S.2d 388 (1987). We are unaware of any decisions to the contrary; none have been cited by appellants.

 Having examined the pertinent legislative history of the Act ourselves, we agree with the analysis of the Minnesota

Court and thus conclude that actions under § 2072 may be brought in the Maryland State courts.

### Evidence Concerning The Bin

Appellants make three arguments with respect to the evidence adduced in support of the claim under § 2072: first, that there was no evidence that the bin was a banned hazardous product when sold to Consolidated in 1986; second, that the evidence failed to establish that the bin tested by Kenneth Thompson, a Consumer Product Safety Commission investigator who testified on Kimberly's behalf, was the one that fell on her; and third, that, even if the bin tested was the one in question, it had been materially altered after the accident and before the test.

Kimberly responds that (1) these attacks have not been preserved for appellate review because they were not properly presented to the trial court, and (2) the evidence was sufficient in any event. We agree with both responses.

At the conclusion of the plaintiff's case, appellants moved for a "directed verdict." Their only argument, other than with respect to the issue of indemnity by Consolidated, was as follows:

"Right. And so far as the evidence in the case, we do not believe that there is evidence to support plaintiff's contention that the—that this matter is going to go forward against this defendant based on the Consumer Product Safety Commission regulations and the ANSI standards, which are not binding, but only recommendations."

That motion was denied, and appellants put on a defense, thereby effectively withdrawing the motion. Md.Rule 2–519(c). At the end of the entire case, appellants renewed their motion, adopting the argument made earlier and adding the legal argument that the Consumer Product Safety Commission regulation did not apply to them.

█ Rule 2–519(a) requires that, in making a motion for judgment, the moving party "shall state with particularity all

reasons why the motion should be granted." This is the same requirement that appears in the analogous criminal rule, Md.Rule 4–324(a), and it means what it says. Failure to state a reason "with particularity" serves to withdraw the issue from appellate review. *State v. Lyles*, 308 Md. 129, 517 A.2d 761 (1986); *Muir v. State*, 308 Md. 208, 517 A.2d 1105 (1986).

This requirement has important and salutary purposes. It implements, on the one hand, a principle of basic fairness. A trial judge must be given a reasonable opportunity to consider all legal and evidentiary arguments in deciding what issues to submit to the jury and in framing proper instructions to the jury. The other parties must have a fair opportunity at the trial level to respond to legal and evidentiary challenges in order (1) to make their own record on those issues and (2) to devise alternative trial strategies and arguments should the court grant the motion, in whole or in part. Allowing these issues to be presented for the first time on appeal is also jurisprudentially unsound, for it may well result in requiring a full new trial that otherwise might have been avoided.

We do not believe that the brief, non-specific argument made by appellants in support of their motions sufficed to present "with particularity" the arguments presented on appeal. A statement that there was insufficient evidence to allow "this matter ... to go forward against this defendant based on the Consumer Product Safety Commission regulations" does nothing to alert the court to a complaint that the evidence failed to establish the condition of the bin in 1986, that the bin tested was the one that fell on Kimberly, or that the bin had been materially altered after the accident. At least in a case of this magnitude, with all of the varied issues presented in a trial that extended over a 25–day period, far more specificity is required. We therefore conclude that the tripartite attack on the evidence underlying the Federal claim now sought to be made by appellants is not preserved for appellate review.

Had we reached those issues, we would have rejected appellant's complaints on the merits. There was testimony

from Wilton Lash, Consolidated's president, indicating that the bin that had been identified as the one falling on Kimberly was among those purchased by Consolidated from Kent Village in 1986 and that it was in the same condition then as it appeared in a photograph taken after the accident. An expert witness, Dr. Dickinson, testified that, if the bin was one of those sold to Consolidated without modification or retro-fitting, the sale would have violated the Act.

There was, to be sure, some conflict in the evidence regarding just what bin Mr. Thompson tested, but evidence was presented sufficient to show that the bin he tested—the one that failed the test—was indeed the bin that fell on Kimberly. In deposition testimony read to the jury, Mr. Thompson said that he reported to the scene of the accident on October 28— the day following the accident. Several children at the scene identified the bin that fell over on Kimberly. Because that bin was then full of trash, he was unable to test it that day, but he did take a number of photographs of it. Six days later, he went to Consolidated's place of business where Mr. Lash told him that Consolidated had brought the bin back to its yard. In response to Thompson's request, Lash identified the bin that had been involved in the accident, and Thompson proceeded to test it. The bin failed the test; it tipped at 146 pounds of vertical force, the standard, as noted above, being 191 pounds.

Thompson compared three sets of photographs—one set taken by the police on the evening after the accident, one set taken when Thompson first inspected the bin on October 28, and a third set taken at Consolidated's yard on November 3 when Thompson actually tested the bin. He stated that one of the photographs taken by the police and a photograph taken by him on October 28 matched and that the photographs taken on October 28 and November 3 matched. He was "absolutely convinced" the photographs were of the same bin. The photographs themselves were admitted into evidence, so the jury could make its own comparison. All of this sufficed to permit the jury to find that the bin Thompson tested on November 3 and found deficient was the same bin that fell on Kimberly.

Part of appellant's argument that the bin tested on November 3 was not the one involved in the accident is based on evidence that the bin inspected on November 3 had a new wheel welded on to it. We have disposed of the issue regarding the identity of the bin, but this evidence is also used by appellants to support their claim that the bin had been materially altered since they sold it to Consolidated, thereby undermining the assertion that the bin was a banned hazardous product when sold in 1986 and when it tipped over on to Kimberly.

Kimberly makes a two-fold response. First, she points out that, even if the wheel had been replaced after the accident but prior to the testing, the likely effect of the new wheel would be to make the bin more, not less, sturdy, and, as it failed the test even with the new wheel, it must have been in at least as bad condition before the wheel was replaced. More important, she points to the testimony of Dr. Dickinson, her engineering expert, that, because he was unable to determine whether the wheel was broken and replaced prior to or after the accident, he did not take the condition of the wheel into consideration in his conclusion that the bin was unsafe.

Although Dr. Dickinson's testimony went more to the negligence count than to the claim under the Consumer Product Safety Act, it supported the inference urged by Kimberly that, if anything, the replacement wheel made the bin more, not less, sturdy, and therefore did not necessarily negate the other evidence that the bin was a banned hazardous product when sold to Consolidated and that it continued to be such a product at the time of the accident.

### ANSI STANDARD

■ The American National Standards Institute (ANSI) is a national safety organization, founded in 1918, consisting of industrial firms, trade associations, technical societies, labor and consumer organizations, and government agencies. According to the *Encyclopedia of Associations* 691 (29th ed. 1994), it serves, among other things "as [a] clearinghouse for

nationally coordinated voluntary standards for fields ranging from information technology to building construction."

In 1977, ANSI adopted a standard for the stability of refuse bins (Standard Z245.3). Groups such as the National Safety Council, the Environmental Protection Agency, the American Society of Mechanical Engineers, the American Public Works Association, the Waste Equipment Manufacturers' Institute, the National Solid Wastes Management Association, municipal governments, labor organizations, and companies and organizations from the insurance and waste disposal industries participated in the development of the standard. The Consumer Product Safety Commission regulation adopted a year later incorporated a number of the performance requirements stated in Standard Z245.3, but to the extent that the ANSI standard was not incorporated into the Commission's rule, it remains a voluntary standard.

James Greco, who chaired the subcommittee that developed the ANSI standard, testified about the standard. Among other things, he noted that the standard placed certain responsibilities on manufacturers, owners, collectors, and customers. One of the responsibilities of a "customer," defined in the standard as "a person who has arranged or contracted for refuse collection service," is to "ensure that refuse bins used and placed on the customer's premises conform to the applicable requirements of this standard." Greco testified that Kent Village was a customer, except for the period when it owned the bin, during which time it would have been an "owner." An "owner" was responsible for ensuring that only refuse bins meeting the performance and safety marking requirements of the standard are used.

Appellants urge that admission of this evidence was inappropriate because (1) the standard applies only to the waste management industry and not to apartment owners, (2) it was never "adopted" by the State of Maryland or Prince George's County, and therefore a violation could not serve as evidence of negligence, and (3) in certain of the hypothetical questions

put to Dr. Dickinson, he was asked to assume facts as to which the evidence was in conflict.

As with the first set of complaints, Kimberly rejoins that these objections were not raised below and have therefore not been preserved and that, in any case, they are without merit. We need not address the preservation question because, whether or not the objections were preserved, they are without merit.

There is nothing in the record to support appellants' contention that the ANSI Standard does not apply to customers such as apartment owners. As noted, the Standard itself places certain responsibilities on customers, and, as defined in the Standard, an apartment owner who contracts for refuse collection service, as Kent Village did, is a customer. Mr. Greco confirmed that in his testimony.

Nor does the fact that the Standard has not been officially adopted as a regulation by the State or the county destroy its relevance as articulating a standard of care, the violation of which may be regarded as evidence of negligence. Although there is some division of authority on the matter, increasingly, upon the establishment of a sufficient foundation, courts have permitted the introduction of voluntary safety codes and standards, such as those promulgated by ANSI, as evidence of applicable standards and have regarded the violation of such standards, where relevant to the factual circumstances of the case, as evidence of negligence./ In *Hansen v. Abrasive Engineering and Mfg.*, 317 Or. 378, 856 P.2d 625, 628 (1993), the Oregon Court noted:

> "Because advisory safety standards that are adopted by nongovernmental entities such as ANSI may represent a consensus regarding what a reasonable person in a particular industry would do, they may be helpful to the trier of fact in deciding whether the defendant has met the standard of care due.

> .  .  .  .  .

> The ANSI advisory standards provide some evidence of the custom in defendant's industry and, therefore, are rele-

vant to the jury's consideration of whether defendant met the standard of care."

(Citations omitted); *see also Wallner v. Kitchens of Sara Lee, Inc.*, 419 F.2d 1028 (7th Cir.1969); *Bailey v. V & O Press Co., Inc.*, 770 F.2d 601 (6th Cir.1985), applying Ohio law; *Stanley v. United States*, 347 F.Supp. 1088 (D.Me.1972), *vacated on other grounds*, 476 F.2d 606 (1st Cir.1973); *Sawyer v. Dreis & Krump Mfg. Co.*, 67 N.Y.2d 328, 502 N.Y.S.2d 696, 493 N.E.2d 920 (1986); *Ward v. City National Bank & Trust Co. of Kansas City*, 379 S.W.2d 614 (Mo.1964); *Winterrowd v. Travelers Indem. Co.*, 452 So.2d 269 (La.App.1984), *aff'd*, 462 So.2d 639 (La.1985); *Coger v. Mackinaw Products Company*, 48 Mich.App. 113, 210 N.W.2d 124 (1973); *Reil v. Lowell Gas Company*, 353 Mass. 120, 228 N.E.2d 707 (1967); *cf. Johnson v. William C. Ellis & Sons Iron Works*, 604 F.2d 950 (1979), *modified on rehearing*, 609 F.2d 820 (5th Cir.1980); *Barzaghi v. Maislin Transport*, 115 A.D.2d 679, 497 N.Y.S.2d 131 (1985), *appeal dismissed*, 67 N.Y.2d 852, 501 N.Y.S.2d 660, 492 N.E.2d 788 (1986); and *see, generally,* Daniel E. Feld, Annotation, *Admissibility In Evidence, On Issue Of Negligence, Of Codes Or Standards Of Safety Issued Or Sponsored By Governmental Body Or By Voluntary Association*, 58 A.L.R.3d 148 (1974), § 7.

■ Although the Maryland appellate courts have not as yet ruled specifically on the issue, it is evident that circuit courts in this State have allowed ANSI standards to be admitted in negligence and product liability cases. *See Kennedy v. Mobay*, 84 Md.App. 397, 579 A.2d 1191 (1990), *aff'd*, 325 Md. 385, 601 A.2d 123 (1992); *Troja v. Black & Decker Mfg. Co.*, 62 Md.App. 101, 488 A.2d 516, *cert. denied*, 303 Md. 471, 494 A.2d 939 (1985). Upon the authority noted, we now hold that, where relevant to the case and upon a proper evidentiary foundation, safety standards promulgated by organizations such as ANSI may be admitted to show an accepted standard of care, the violation of which may be regarded as evidence of negligence.

■ Appellants' final complaint, with respect to this issue, is that Dr. Dickinson was allowed to assume certain facts not established by the evidence in responding to hypothetical questions regarding the applicability of the ANSI Standard. That is not the case. Although there were, to be sure, disputes as to some of the components of the hypothetical questions put to Dr. Dickinson, there was abundant evidence to support the hypotheses. It is not impermissible to ask a witness, in responding to a hypothetical question, to assume the truth of relevant facts as though they were not contested "as long as there is evidentiary support for the facts which the expert is told to assume the veracity of and evaluate in rendering his opinion." *Kruszewski v. Holz,* 265 Md. 434, 445, 290 A.2d 534 (1972).

## TESTIMONY OF DR. DAVIS

In support of her claim for future health care and living expenses, Kimberly produced testimony from Estelle Davis, who holds a doctorate in rehabilitation counseling and is a national and State certified rehabilitation counselor. Her expertise as a rehabilitation counselor was accepted by the court and is not challenged by appellants. One of the things she does is to prepare "life care plans" for persons with spinal cord injuries; she stated that she had previously been accepted by courts as an expert "in the preparation of life care plans as a rehabilitation counselor."

Dr. Davis's testimony was extensive. She had prepared a life care plan for Kimberly in which she attempted to estimate Kimberly's future needs and the cost of meeting those needs. Those needs include medical needs, attendant care, special education, housing, nutrition, and transportation, among others. In determining those needs, and the cost of meeting them, Dr. Davis had to make certain assumptions concerning Kimberly's present and future medical condition. Appellants' principal attack on this evidence is that there was no *medical* evidence from qualified medical experts sufficient to support it; they complain that the court allowed Dr. Davis, who is not

a physician, to render medical opinions and other opinions based on hearsay.

It has long been accepted in Maryland, as a matter of common law, that an expert witness may express an opinion that is based, in part, on hearsay if the hearsay is of a kind that is customarily relied on by experts in that particular calling. *See Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 603, 495 A.2d 348 (1985); McLain, *Maryland Evidence* (1987), § 703.1. That principle is now embodied in Md.Rule 5–703(a). Dr. Davis stated that it was usual and customary in her field of rehabilitation counseling to rely on medical personnel, social workers, and psychologists, as well as on relevant records, statistical data, and literature, "in order to get a full picture of the individual that we're working with, because my field crosses professions." That was not disputed by appellants.

To describe and respond to each particular aspect of Dr. Davis's long testimony challenged by appellants would unnecessarily prolong this Opinion. We are satisfied, having reviewed her testimony and the exhibit prepared by her, that her opinions were adequately supported by medical evidence, where that kind of support was required, or by other facts that it was reasonable for Dr. Davis to consider. We find no abuse of discretion in the court's allowing her opinion evidence.

## ANNUITIZATION

Md.Code Cts. & Jud.Proc. art., § 11–109(b) requires the trier of fact, in any action for damages for personal injury, to itemize a damage award to reflect the amounts intended for past medical expenses, future medical expenses, past loss of earnings, future loss of earnings, non-economic damages, and other damages. Subsection (c)(1) provides, in relevant part:

"The court ... may order that all or part of the future economic damages portion of the award be paid in the form of annuities or other appropriate financial instruments, or that it be paid in periodic or other payments consistent with the needs of the plaintiff, funded in full by the defendant or

the defendant's insurer and equal when paid to the amount of the future economic damages award."

In this regard, "economic damages" is defined as "loss of earnings and medical expenses." If the court directs payment of future economic damages in a form other than lump sum, it must order the defendant to provide adequate security.

Following the jury's verdict, appellants moved the court to order that the $10,965,085 awarded for future medical expenses and the $490,075 awarded for future loss of earnings be paid in the form of an annuity. The $10,965,085 represented the jury's determination of the present cash value of Kimberly's future medical needs, the aggregate cost of which, according to her evidence, was just over $101,700,000. Appellants proffered to the court that, through their insurer, they could secure that future stream of medical expenses with an annuity purchased from Transamerica Occidental Life Insurance Company for $5,171,000. In effect, then, they sought to discharge the jury's award of $10,965,085 with a payment of $5,171,000.

The court rejected that offer. Instead, it directed that the $12,690,002 judgment be paid as follows:

(1) $5,161,881, representing attorneys' fees, litigation costs, and liens filed against the judgment, be paid in a lump sum;

(2) $2,509,372, representing one-third of the balance, be placed in a trust for Kimberly pursuant to Md.Code Estates & Trusts art., § 13–401—13–407 (Recovery By Minor In Tort Act); and

(3) $5,018,745—the rest—be used to purchase tax-free annuity policies for Kimberly pursuant to Cts. & Jud.Proc. art. § 11–109, subject to a supplemental order to be entered when all appeals are completed.

■ Appellants argue that the court erred in refusing to accept its plan, which it characterizes as "tailor-made" for § 11–109. Rejection, it urges, "rendered meaningless the statute and the public policy considerations of tort reform as embodied in the statute." We disagree.

We start by pointing out that § 11–109 does not, as appellants' argument implies, *require* a court to permit the periodic payment of future economic damages. Section 11–109(c)(1) states that a court *may* order all *or part* of an award of such damages to be discharged through periodic payments. It is a discretionary call on the court's part, which is subject to appellate review only in terms of whether the court abused its discretion.

Appellants' plan called for specific periodic payments through the year 2063. We certainly see no abuse of discretion in not requiring counsel, who earned their contingent one-third fee, to wait nearly 70 years to collect it, or to require all litigation expenses and liens to be discharged from the balance of the judgment. The annual periodic payments provided for in appellants' plan were fixed and not subject to modification. As Kimberly noted, however, her financial needs might not coincide with those fixed amounts each year, and she complained about the inflexibility of the plan. That was certainly a proper consideration for the court.

The court expressed additional concern about reliance on a single source, however stable at present, as security for payment 69 years into the future; we do not regard that concern as inappropriate. *See Muenstermann by Muenstermann v. U.S.*, 787 F.Supp. 499, 527 (D.Md.1992), where Judge Northrop, though recognizing the general virtue of an annuity to provide for future expenses, nonetheless rejected a plan that relied on one insurer to secure payments through the year 2065, observing that "[r]elying on one company, the insurance company that underwrites the annuity, to last that long may actually place more risk on the Plaintiffs than having them diversify their investment portfolio among a range of public and private bonds and securities and certificates of deposits."

All of these concerns were legitimate, and we therefore find no abuse of discretion in the court's resolution of the matter. As a result, we need not address Kimberly's more substantive argument that § 11–109 must be invoked before the jury renders a verdict and that the court was powerless to allow

appellants to discharge the jury's award of future damages through payment of an amount less than that award.

## CROSS–CLAIM AGAINST CONSOLIDATED

Appellants filed a three-count cross-claim against Consolidated. They alleged, essentially, that Consolidated owned the allegedly defective bin and should have been aware of the Consumer Product Safety Commission regulation, both at the time of the 1986 sale and at the time of the accident. In Count I, they asked for contribution, apparently as an alleged joint tortfeasor. In Count II, they sought full recovery on the ground that Consolidated was the active and primary tortfeasor; in Count III, they sought indemnity based on the service agreement. It appears that Consolidated also filed a cross-claim for indemnification against appellants. That claim was submitted to the jury, which found in favor of appellants.

For whatever reason, appellants' cross-claim was not submitted to the jury. It was considered by the court through a post-trial motion and denied without comment. A motion to revise the judgment for Consolidated was also denied without comment. We cannot tell, therefore, and appellants were unable to enlighten us at oral argument, why the cross-claim was denied—whether because the court found no substantive liability by Consolidated or because the only potential liability was for contribution as a joint tortfeasor and appellants, as of then, had paid nothing toward the judgment. In the interest of justice, we shall remand that aspect of the case to the circuit court for further explanation. If the cross-claim was denied solely as being premature, the court should so indicate, to avoid unnecessary issues and debate if and when the claim ripens.

## THE CAP—FEDERAL PREEMPTION

In her cross-appeal, Kimberly complains about the reduction in the verdict arising from application of the State statutory "cap" on non-economic damages. Her argument is directed solely to the award under Count I—the claim under the Consumer Product Safety Act—although, as the same

damages were awarded under both counts, that limitation is without practical consequence in this case. Her point, in a nutshell, is that this is an action created exclusively by Act of Congress, that the statute (§ 2072(a)) allows her to recover "damages sustained," and that it is impermissible under the Supremacy Clause for a State to curtail that right.

This appears to be a case of first impression in the country. We have been referred to no case, in either the State or the Federal system, addressing this precise question, and we have found none.

As we have concluded that, by acquiescence if not by expression, Congress did not intend to preclude actions under § 2072 from being brought in State courts, we must look to see whether, in allowing State court actions, Congress intended nonetheless to exempt those actions from general State-law limitations that otherwise would apply to them. It is a matter of statutory construction and thus, in the end, one of legislative intent.

In enacting the Consumer Product Safety Act, Congress did indeed consider the effect of the statute on State law in a number of respects. In § 2074, for example, it provided that compliance with consumer product safety rules "shall not relieve any person from liability at common law or under State statutory law to any other person" and that the failure of the Consumer Product Safety Commission to take action with respect to the safety of a consumer product "shall not be admissible in evidence in litigation at common law or under State statutory law relating to such consumer product." Section 2075, subject to certain exceptions, generally precludes a State from establishing or continuing safety standards or regulations less protective than the requirements of a Federal standard. Section 2072 itself, in subsection (c), states that "[t]he remedies provided for in this section shall be in addition to and not in lieu of any other remedies provided by common law or under Federal or State law."

These provisions, forged as a compromise during the legislative process, evidence, on the one hand, a clear intent to establish national standards in terms of the basic regulations

governing consumer product safety and, on the other, an equally clear intent not to preempt traditional State-law remedies that may apply to circumstances also giving rise to an action under § 2072. Regrettably, however, they give no clue with respect to the question at hand. The closest expression we have unearthed appears in the Report of the House Committee on Interstate and Foreign Commerce accompanying H.R. 15003. In describing what became § 2072, the Report states:

> "The Committee anticipates, in cases in which it is established that death, personal injury, or illness occurred by reason of noncompliance with the consumer product safety rule or section [2064] order, that the courts will in general apply State law as to questions of which types of damages may be recovered and which parties in addition to the injured person can recover damages. The committee intends that any person who recovers damages by reason of personal injury, illness, or death, would also be able to recover for any property damage occurring by reason of the noncompliance giving rise to the injury, illness, or death."

H.R.Rep. No. 1153, 92nd Cong., 2d Sess. 47–48 (1972).

So far, the only question that appears to have been addressed in this regard is whether punitive damages are recoverable in a § 2072 claim. In *Wahba v. H & N Prescription Center, Inc.,* 539 F.Supp. 352 (E.D.N.Y.1982), the Court held that individual State law governed. With appropriate quotation from earlier cases, Judge Weinstein observed, in relevant part, that the choice between national uniformity and State conformity depends on whether the implementation of Federal interests requires overriding the particular State rule, that "[w]here federal objectives can be realized only through a uniform rule, the vagaries of state law will not be allowed to frustrate national goals," but that "where programs and actions do not by their nature require uniformity, the courts of each state will be free to resort to state law." *Id.* at 357 (citations omitted).

Applying that principle, Judge Weinstein concluded that the cause of action created by § 2072 "is essentially one sounding

in tort, an area of the law traditionally the province of the states," and that, when entering this field, Congress has generally enacted legislation "dependent upon state law for gap-filling." *Id.* Promotion of Federal policy, he decided, did not require such uniformity with respect to punitive damages as would justify displacing existing State law on the subject. In the particular action—one for wrongful death—the relevant State law was that of New York, which did not allow punitive damages in that kind of action. For that reason, he concluded that such damages were not available. *See also Drake v. Lochinvar Water Heater, Inc.,* 618 F.Supp. 549 (D.Minn.1985), *rev'd on other grounds sub nom. Drake v. Honeywell, Inc.,* 797 F.2d 603 (8th Cir.1986); *Young v. Robertshaw Controls Co.,* 560 F.Supp. 288 (N.D.N.Y.1983)

In *Baas v. Hoye,* 766 F.2d 1190 (8th Cir.1985), the Court reached the same conclusion but for a very different reason. That court concluded that the only right afforded under § 2072 was to "damages sustained," and that meant only compensatory damages. In the consideration of this legislation, the Court noted, Congress had rejected a provision allowing treble damages, thus indicating its intent that punitive or exemplary damages not be allowed. It was not a matter of State law but rather a limit imposed by Congress itself. Though rejecting *Wahba* in that regard, the *Baas* Court announced its agreement that "the measure of recovery under the Act is a function of state rather than federal law." It stated, at 1196:

> "In our view, the federal statute limits recovery to compensatory damages, but because Congress did not specify the breadth and scope of compensatory damages available, one must look to the applicable state law for guidance. We find this view consistent with the statement in the legislative history that '[t]he committee anticipates * * * that the courts will in general apply State law as to questions of which types of damages may be recovered.'"

(Citation omitted).

Unlike the situation with respect to certain other Federal statutes, where there is a clear statement as to the adoption or

exclusion of State law in the enforcement of Federally-created rights of action (*see, e.g., Power v. Arlington Hosp. Ass'n,* 42 F.3d 851 (4th Cir.1994), applying a State "cap" on damages to an action under Emergency Medical Treatment and Active Labor Act), the evidence with respect to the Consumer Product Safety Act is more ambiguous. Congress gave persons a Federal right to recover "damages sustained" by reason of a violation of a consumer product safety rule. The only limitation on that right expressed in the statute is that, if suit is filed in Federal court, the amount in controversy must exceed $10,000.

There are a host of State procedural and substantive requirements that, if applied, might impede or diminish the right when pursued in a particular State court, and thereby create national disuniformity in the enforcement of the right. As the *Wahba* Court observed,

> "[t]he Act leaves many questions unanswered such as what period of limitation applies; does the right survive the death of the injured party; are principles of contributory or comparative fault operative; who is a 'person injured' with standing to maintain the action as well as what types of damages may be recovered."

539 F.Supp. at 356. We could add a few other vagaries as well—whether and to what extent the doctrine of assumption of risk applies and whether, under what circumstances, and to what extent recovery can be had for loss of consortium, for example.

Kimberly urges that Congress could not have intended a claim under § 2072 to be subject to the Maryland "cap" on non-economic damages because that "cap" was not in existence in 1972 when § 2072 was enacted. We reject that form of analysis. To the extent that Congress anticipated, and implicitly approved, the application of State law to § 2072 actions filed in the State courts, it surely did not intend to subject those actions only to the various State laws in effect in 1972. There is no support anywhere in the legislative history for

that proposition; nor would it be reasonable for Congress to mandate such a result.

The proper focus, we think, is on whether the State law or procedure, if applied, would so impede the Federal right as to frustrate the Congressional intent. It is essentially a qualitative analysis. In allowing § 2072 claims to be filed in State courts without directing either particular or categorical circumscriptions of State law, Congress must necessarily have anticipated that at least some conditions or limitations, uniformly applied to like kinds of action, would be applied to these actions as well.

We do not regard the statutory "cap" on non-economic damages—$350,000 in this case, later increased by the General Assembly to $500,000—to so impede the Federal right as to frustrate the Congressional intent. It is a limit that is applicable now to all personal injury actions in Maryland and thus is uniform in its application; it is the kind of limit that is not uncommon among States; it applies to only one category of damage—the category least quantifiable on an objective basis and most subject to inflation through jury passion or sympathy; and it is set high enough to compensate most injured victims for the pain or disfigurement they may suffer. We therefore find no error in the court's reduction of the verdict.

JUDGMENT IN FAVOR OF CONSOLIDATED ON APPELLANTS' CROSS–CLAIM REMANDED FOR FURTHER PROCEEDING IN ACCORDANCE WITH THIS OPINION; JUDGMENTS OTHERWISE AFFIRMED; APPELLANTS TO PAY THE COSTS.