63 A.3d 620

David A. BARNES, et al.

v.

GREATER BALTIMORE MEDICAL CENTER, INC., et al.

No. 0789, Sept. Term, 2011.

Court of Special Appeals of Maryland.

March 21, 2013.

458

Andrew H. Baida (Stuart A. Cherry, Rosenberg, Martin, Greenberg, LLP, Baltimore, MD, Christian A. Lodowski, Towson, MD), on the brief, for appellant.

Ronald W. Shaw & M. Natalie McSherry (Amanda P. Just, Shaw, Joseph & Just, PA, Hunt Valley, Katrina J. Dennis, Kramon & Graham PA, Baltimore, MD), for appellant.

Panel: WOODWARD, ZARNOCH, JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

ZARNOCH, J.

## STATEMENT OF THE CASE

In this appeal, we are confronted with another twist in the interpretation of the certificate requirement of the Healthcare Malpractice Claims Act ("HCMCA" or "the Act"), Maryland Code (1974, 2006 Rep. Vol., 2012 Supp.), Courts and Judicial Proceedings Article ("CJP"), §§ 3–2A–01–10. In the Circuit Court for Baltimore County, appellee/cross-appellant Greater Baltimore Medical Center ("GBMC")[1] moved to dismiss appellants'/cross-appellees', David A. Barnes and Laura A. Barnes, medical malpractice claim for failure to file a proper certificate of qualified expert.[2] GBMC argued that the expert report did not explain the expert's opinions as required by the Act. This motion came not early in the proceedings, but on the eve of a second trial, when the expert had already testified at the first trial.[3] The circuit court denied the motion. For reasons to be explained more fully, we affirm the court's ruling and conclude that GBMC's possession of the expert's mistrial testimony before the second trial cured any lack of detail in the expert report.

This case took another turn in the second trial after the jury found in favor of appellants, when the circuit court granted the motion for judgment notwithstanding the verdict ("JNOV") of GBMC and appellees Dr. Jose V. Rustia, and Charles Emergency Physicians, P.A. ("CEP"). Previously, appellees had

---

1. Additional defendants, including Dr. Jose V. Rustia and Charles Emergency Physicians, P.A., also moved to dismiss based on a faulty certificate and report. However, GBMC is the only defendant appealing the denial of the motion.

2. This opinion will refer to the parties simply as appellants and appellees.

3. After four days of the first trial, the judge declared an "administrative" mistrial because of a snowstorm.

moved for judgment as a matter of law at the close of the Barneses' case and at the close of all evidence. The court denied these motions and the jury found in favor of the Barneses and awarded damages of $1,123,000. In granting the JNOV motion, the court found that the Barneses did not provide legally sufficient evidence of causation. The Barneses appeal this ruling. On this issue, we conclude that the Barneses did produce sufficient evidence for the jury verdict and the circuit court erred in granting the JNOV. We will therefore reverse the court's ruling and order reinstatement of the jury verdict.

As a final issue, GBMC appeals the denial of its motion for judgment, arguing that the Barneses did not produce sufficient evidence for the case to even proceed to the jury. For reasons that follow, we reject GBMC's contentions.

## FACTS AND LEGAL PROCEEDINGS

David Barnes went to see his primary care physician, Dr. Allen Halle, on January 26, 2005, because he was experiencing weakness in his right hand grip, numbness, and tingling in his right arm. Dr. Halle was concerned that Mr. Barnes was having a transient ischemic attack (mini-stroke) or was in the beginning phases of a stroke. He called Mrs. Barnes and told her that her husband needed to go to the hospital immediately. Mrs. Barnes picked up her husband and drove him to GBMC. Dr. Halle also gave Mrs. Barnes a note that she was to give to the registration desk upon arrival. The note stated that Dr. Halle wanted Mr. Barnes to have a "stroke work up."

Mr. Barnes arrived at GBMC around 5:20 p.m. He first saw the "quick look nurse," Candance Starstrom, who determines where the patients should be routed and which patients should be seen by the triage nurse. The triage nurse performs a more thorough assessment. The Barneses told Nurse Starstrom that his primary care physician sent Mr. Barnes to the emergency room. Nurse Starstrom also read Dr. Halle's note. On the hospital assessment form, there is a space to indicate the priority of a patient's condition, one being the

most serious and four being the least. Nurse Starstrom circled that Mr. Barnes' condition was a priority number one. Nurse Starstrom testified that priority number one "represents a potentially life threatening situation and should be automatically routed to the main emergency department." She also wrote on the form that Mr. Barnes "had a weak right grip, tingling in the right hand, a numb right side, and that he had been seen by his primary care doctor and directed to the GBMC emergency room." She then attached Dr. Halle's note to the front of the form.

Mr. Barnes was sent to the triage nurse, Carol Stopa, at 5:49 p.m. Nurse Stopa testified that she did not see Dr. Halle's note. The Barneses argued that Nurse Stopa changed the priority from one to four on the form, and crossed out the word "side" and changed it to "hand" so it said "numb right hand" instead of "numb right side." Although she did not remember the incident, Nurse Stopa testified that the signature on the form was probably hers and some of the writing was hers. Nurse Stopa sent Mr. Barnes to the urgent care department (for less serious conditions), not the emergency department.

Mr. Barnes then saw Dr. Rustia, the emergency medicine physician who was on duty in the urgent care center. Dr. Rustia testified that he did not see Dr. Halle's note, and if he had, he would have walked Mr. Barnes over to the main emergency department to have the stroke work up. Dr. Rustia ordered a wrist x-ray, diagnosed Mr. Barnes with carpal tunnel syndrome, gave him pain medication, prescribed an anti-inflammatory medication, and told him to follow up with a hand surgeon.

As Mr. Barnes was leaving at around 6:20 p.m., Nurse Starstrom saw him in the parking lot and felt that he had not been there long enough to have a stroke work up. She looked at Mr. Barnes' assessment form and saw that he did not receive the work up. She told the charge nurse, Lori Hart, and Nurse Hart called Dr. Halle, who instructed her to call Mr. Barnes and have him return to the emergency room. She left a message on the Barneses' answering machine at 6:40

p.m. The Barneses live thirty to forty minutes from GBMC and returned to the hospital around 8:30 p.m.

Upon returning, Mr. Barnes received at least a partial stroke work up. The nurses started him on an IV, drew blood, conducted blood tests, ordered a CAT scan of the brain, and performed an electrocardiogram. Dr. Elias Abras was the emergency room physician who examined Mr. Barnes. He ruled out a hemorrhagic stroke based on the CAT scan. After a few other tests, Dr. Abras concluded that Mr. Barnes needed to be admitted because he "needed more evaluation" and that the evaluation "ha[d] to be done by the attending physician." Since Mr. Barnes had medical insurance through Kaiser Permanente, Dr. Abras testified that he needed a Kaiser hospitalist to admit Mr. Barnes.[4] The only Kaiser hospitalist on duty that evening was Dr. Vikesh Singh. Dr. Abras called Dr. Singh and asked him to come evaluate and admit Mr. Barnes. Dr. Singh said he would come as soon as possible. Dr. Abras continued to call Dr. Singh for several hours, but Dr. Singh never arrived. Tired of waiting, Mr. Barnes wanted to go home. Dr. Abras claimed to have told Mr. Barnes that "he had a mini-stroke and it was important for him to follow up with Dr. Halle in the morning to complete the evaluation." Mrs. Barnes said "I was never told a diagnosis."[5] Dr. Abras discharged Mr. Barnes around 1:00 a.m. on January 27.

The next day, Mrs. Barnes went to work. Mr. Barnes called Dr. Halle and told him about the previous day's events. Dr. Halle planned for Mr. Barnes to see a neurologist on January 31, and he planned for Mr. Barnes to have an MRI, a doppler study of his neck, and an echocardiogram within one week. But when Mrs. Barnes came home, Mr. Barnes was sitting in a recliner with his back to her. She asked about the doctor. He pointed to a piece of paper on her vanity. Mrs.

---

4. Based on Dr. Abras' testimony, a "hospitalist is a physician who stays in the hospital and he attends and take[s] care of the patients assigned to him."

5. Mr. Barnes did not testify at either trial.

Barnes looked at the note on vanity, but it was nothing but scribbles. So then she walked around so she could see Mr. Barnes and asked if he was okay. But he did not look okay: "[h]is mouth was all crooked." At that point Mrs. Barnes' cousin drove the Barneses to GBMC. Mr. Barnes had suffered a stroke.

The Barneses waived arbitration under CJP § 3–2A–06(B) and filed suit in the Circuit Court for Baltimore County against GBMC, Dr. Rustia, and CEP.[6] The Barneses filed a certificate of qualified expert and expert report, as required by CJP § 3–2A–04. Dr. Kenneth Larsen signed the certificate and report. He was later deposed. After several motions and additional discovery, a trial began on February 2, 2010 and Dr. Larsen fully testified at this trial. After four days of trial, the circuit court had to declare an administrative mistrial because of a massive snow storm.

The second trial was set to begin in March 2011. The defendants filed several more motions based on the events of the first trial, including one to prohibit Dr. Larsen from testifying regarding proximate cause. The day before the second trial started, GBMC moved to dismiss the case for failure to file a proper certificate of qualified expert. GBMC argued that the report was insufficient because case law required that the report describe the standard of care, how the specific defendants violated the standard of care, and how the violation proximately caused the plaintiff's injuries. After a discussion of the case law, the circuit court denied the motion to dismiss, finding that GBMC was too late in filing the motion.

During trial, one of the plaintiff's other experts, Dr. Marion Lamonte, testified regarding the breach of the standard of care and proximate cause. GBMC and Dr. Rustia believe that Dr. Lamonte's proximate cause testimony did not include that Dr. Rustia should have admitted Mr. Barnes to the hospital. But during Dr. Lamonte's direct testimony, the Barneses'

---

6. The Barneses eventually added Dr. Abras and Dr. Singh as defendants. Dr. Singh and the Barneses settled before trial.

attorney asked "[a]nd had Dr. Rustia thought of a TIA [transient ischemic attack], what would the standard of care require Dr. Rustia to do?" GBMC's attorney objected. After a bench conference, Dr. Lamonte testified "[h]e could have moved the patient to the main emergency department immediately and contacted the physician in charge of the main emergency department for acute work up and treatment or he could have called Admission himself, right then, and got the patient admitted." GBMC's attorney objected and the testimony was stricken. Later, at a bench conference, the judge said, "[Dr. Lamonte] never opined that Dr. Rustia should have admitted the patient."

The Barneses feel that Dr. Lamonte did end up testifying that GBMC and Dr. Rustia breached the standard of care in not admitting Mr. Barnes the evening of January 26. Dr. Lamonte testified, without objection, that "every hospital had a policy regarding admission of acute neurologic emergencies" because "the evaluation, management, [and] treatment cannot be performed on an outpatient basis." She said "everybody would have put him in a hospital." She also testified on cross examination, without objection:

Q: All right and it's likely, under the protocol, if Dr. Rustia had seen the note, the protocol would have been to send the patient to the emergency department, the main emergency department correct?

A: Yeah, or just admit him. He probably would have done that.

The Barneses further believe that Dr. Lamonte testified that if Mr. Barnes had been admitted to GBMC, his stroke would have been prevented. She opined that bed rest, oxygen, and IV fluids would have prevented Mr. Barnes' stroke or delayed it until the appropriate studies could be done and surgery initiated. She further testified that Mr. Barnes would have received an endarterectomy if he would have been admitted, and this would have prevented the stroke.[7] Dr. Lamonte

---

7. A Carotid endarterectomy is an operation to prevent a stroke during which a vascular surgeon removes the inner lining of the carotid artery if it has become thickened or damaged.

opined that "it was most likely more than fifty percent his stroke would have been prevented" if he had been admitted to the hospital. She said the "normal sequence of events" for a patient with Mr. Barnes' symptoms "is to get a patient's head flat first, to give them intravenous fluids, to increase the volume that will go to their brain and to give them oxygen."

At the close of the Barneses' case in chief, the defendants moved for judgment as a matter of law on causation grounds. They argued that there was no evidence establishing that if Dr. Rustia had sent Mr. Barnes to the main emergency room the first time he went to the hospital, Mr. Barnes would have been admitted for the additional treatment or undergone the testing that was necessary to prevent his stroke. The circuit court denied the motion. The court said "there is no specific testimony ... from Dr. Lamonte saying two or three hours earlier presentation or admission to the hospital would have made a difference" but, "at this junction, I feel there is sufficient evidence there in looking at the case in a light most favorable to the Plaintiff on the causation issue to allow it to go forward...."

The defendants renewed the motion for judgment at the close of evidence on the same grounds and the court again denied the motion. The jury found in favor of the Barneses and against GBMC, Dr. Rustia, and CEP in the amount of $1,123,000, consisting of $200,000 for loss of household services, $73,000 for future medical expenses, $750,000 in noneconomic damages, and $50,000 for loss of consortium. The jury did not find Dr. Abras negligent.

GBMC and Dr. Rustia moved for a post-trial JNOV. The circuit court granted the motion, finding insufficient evidence of causation. The court stated, "this Court looks at whether Dr. Lamonte has a nexus between the violations of the standard of care as it relates to Nurse Stopa and Dr. Rustia and whether or not the ultimate stroke that Mr. Barnes clearly suffered on January the 27th was proven, preventable." The court concluded,

[Dr. Lamonte's] testimony on causation lacked foundation, did not provide legally sufficient testimony for the jury to find that as a result of the violation of the standard of care by Nurse Stopa and Dr. Rustia, that Mr. Barnes had a stroke and that if the had complied with the standard of care, that his stroke was preventable.

The Barneses timely appealed the grant of the JNOV, and GBMC timely appealed the denial of its motion for judgment at the close of the evidence and its motion to dismiss for failure to file a proper certificate of qualified expert.

## QUESTIONS PRESENTED

We are presented with three questions on appeal (one from appellants, the Barneses, and two from appellee GBMC), which we have reordered and recast as follows: [8]

1. Did the circuit court err in denying GBMC's motion to dismiss for failure to file a legally sufficient report from a qualified expert?

2. Did the circuit court err in granting appellees' motion for judgment notwithstanding the verdict based on insufficient causation evidence?

3. Did the circuit court err in denying GBMC's motions for judgment based on insufficient evidence?

We answer the first and last questions in the negative and the second question in the affirmative. We therefore affirm the decision of the circuit court denying the motion to dismiss,

---

8. The Barneses phrased their question as follows:

Was there a sufficient basis for the jury's finding that Defendants' negligence was a proximate cause of the permanent, disabling injuries Mr. Barnes suffered?

GBMC asks:

1. Did the trial [court] err in denying GBMC's motion to dismiss based on Appellants' failure to file a legally sufficient report from a qualified expert?

2. Did the trial court err in allowing the case to go to the jury when Appellants failed to present legally sufficient evidence from which the jury could find GBMC liable for Appellants' harm?

reverse the judgment granting the motion for JNOV, and remand for reinstatement of the jury verdict.

## DISCUSSION

### I. Motion to Dismiss

#### A. Relevant Facts

When the Barneses brought suit against GBMC, they filed a certificate of qualified expert and an expert report, as required by CJP § 3–2A–04. The certificate and report were signed by Dr. Kenneth Larsen. Dr. Larsen's report stated:

> It is my opinion to a reasonable degree of medical probability that the care and treatment of David Barnes by Jose V. Rustia, M.D., Charles Emergency Physicians, P.A. and Greater Baltimore Medical Center departed from the applicable standards of care and that such departures are the proximate cause of the alleged injuries and damages.

Dr. Larsen was deposed and fully testified at the first trial. The trial testimony on standard of care and causation was, in part:

Q: Does the standard of care require the triage nurse to read that note?

A: Yes

... Q: I want to proffer to you that Nurse Stopa was the triage nurse and that she changed the priority from 1 to 4, sent the patient to Urgent Care. Do you have an opinion to a reasonable degree of medical certainty as to whether that complied or didn't comply with the standard of care?

A: My opinion is that it does not comply with the standard of care. If you have taken a patient who was triaged by one of your patriot [*sic*] nurses with significant experience in the Emergency Department that interviewed this patient and decided he needed the most urgent care of triage, and then you decide basically on your own that they need the least urgent care.

You have a note in front of you sent by their doctor, a note on the chart that says why they were sent by the

doctor, yet, you make a decision on your own without consulting anybody, either the nurse who did the quick look who assigned the most priority or the doctor that wrote the note on the chart or anyone else in the department. To go backward and downgrade this patient to the lowest priority and send him essentially to a minor care area does not comply with the standard of care.

If she had gone and talked to Nurse Starstrom and the two of them put their heads together and decided that a change in triage priority was a reasonable thing to do, I would not have this particular criticism. She didn't do that. She made this decision on her own without consulting either the physician that sent the patient or the nurse that saw him first.

... Q: In order for a nurse to change the priority, what does the standard of care require the nurse to do?

A: She has to look at all the available materials like what is written on the triage sheet in front of her and what is written on the note attached to it. She has to assess the patient, she has to talk to the patient and do some degree of examination.

... Q: Do you have an opinion as to where, if Nurse Stopa had read the note and followed the doctor's order, Mr. Barnes would have been routed to?

A: He would have been sent to the main Emergency Department [ED] if it had not been changed.

... Q: Do you have an opinion to a reasonable degree of medical probability what would have happened to Mr. Barnes had he been routed correctly to the ED relative[ ] to care and treatment in the ED?

A: I believe that if Mr. Barnes would have been sent originally to the main Emergency Department instead of the Urgent Care Center, he would have had all the tests done. [ ]

Q: Going back to your question, had Mr. Barnes been directed to the correct main ED, do you have an opinion as to what the appropriate stroke workup would have been?

A: He would have done what he had done when he came back on his second visit, had a CAT-scan, the number of blood tests that had been done, and the electrocardiogram. He then would have been admitted to the hospital.

(Objections that were overruled omitted).

After the mistrial and the day before the second trial, GBMC[9] filed a motion to dismiss based on the Barneses' failure to attach a legally sufficient report to their certificate of qualified expert.[10] GBMC felt that the expert report that accompanied the certificate was insufficient because it merely stated that GBMC violated the standard of care and that the violations were the proximate cause of Mr. Barnes' injuries, but did not go into any further explanation. The Barneses argued that the motion was filed too late, and GBMC responded that the HCMCA permits them to challenge the certificate at any time. The circuit court denied the motion, stating that,

the purpose of those certificates of merit is to allow Defendants an opportunity to understand the basis for the claims against them and to properly defend and in this case I believe there has been adequate time over the last six years for the Defendants to have those opportunities to defend the case and prepare and I'm not going to dismiss the case at this junction on the grounds of a faulty certificate of merit.[11]

GBMC contends that this ruling was improper because deficiencies in the certificate cannot be waived.

---

9. Although Dr. Rustia and CEP also challenged Dr. Larsen's certificate and report at trial, they did not file a cross-appeal or raise the issue in their brief. Thus, they have waived their appeal on the denial of their motion. Md. Rule 8–202.

10. The Court of Appeals has determined that the certificate requirement includes both a certificate and an expert report. *See Walzer v. Osborne,* 395 Md. 563, 579, 911 A.2d 427 (2006).

11. The certificate of qualified expert is sometimes referred to as a certificate of merit. *Breslin v. Powell,* 421 Md. 266, 268 n. 1, 26 A.3d 878 (2011).

## B. Standard of Review

■ This issue requires us to interpret the certificate requirement of the Health Care Malpractice Claims Act. A question of statutory interpretation is reviewed *de novo*. *Walter v. Gunter*, 367 Md. 386, 392, 788 A.2d 609 (2002). Thus, we determine if the circuit court was legally correct in its interpretation of the Act. *Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 618, 994 A.2d 411 (2010). If we find that the circuit court correctly interpreted the HCMCA to permit the denial of the motion to dismiss, then we must also determine if the specific facts support the denial. This we also review *de novo*. *Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128, 142, 46 A.3d 443 (2012). Furthermore, "an appellate court will affirm a circuit court's judgment on any ground adequately shown by the record, even one upon which the circuit court has not relied or one that the parties have not raised." *Pope v. Board of Sch. Comm'rs*, 106 Md.App. 578, 591, 665 A.2d 713 (1995). In other words, we can affirm the trial court if it reached the right result for the wrong reasons. *Id.*

## C. The Current State of the Certificate of Qualified Expert Requirement

We begin with a discussion of the Act's certificate requirement. A plaintiff filing a suit that falls under the Act,[12] such as the Barneses' claim, must provide a certificate of qualified expert or his case will be dismissed without prejudice.[13] The

---

12. The Act applies to:

    All claims, suits, and actions, including cross claims, third-party claims, and actions under Subtitle 9 of this title, by a person against a health care provider for medical injury allegedly suffered by the person in which damages of more than the limit of the concurrent jurisdiction of the District Court are sought are subject to and shall be governed by the provisions of this subtitle.
    CJP § 3–2A–02(a)(1).

13. Specifically, CJP § 3–2A–04(b)(1)(i)(1), reads:

    Except as provided in item (ii) of this paragraph, a claim or action filed after July 1, 1986, shall be dismissed, without prejudice, if the

expert is qualified only if he meets certain requirements, which include not devoting annually more than twenty percent of the expert's professional work to activities that directly involve testimony in personal injury claims, CJP § 3–2A–04(b)(4), and "hav[ing] had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action." CJP § 3–2A–02(c)(2)(ii)(A). The Act also requires that along with the certificate, the plaintiff must include an expert report.[14]

Many appellate opinions have interpreted these provisions. The Court of Appeals has concluded that the expert's report is part of the certificate requirement. *Walzer v. Osborne*, 395 Md. 563, 579, 911 A.2d 427 (2006). Thus, the statute requires dismissal when the plaintiff fails to file a certificate or fails to file a report. *Id.* at 578, 911 A.2d 427. Additionally, the appellate courts have determined that there is no distinction between failing to file a certificate and failing to meet the certificate requirements; failure to file a proper certificate is tantamount to failing to file at all and requires dismissal without prejudice. *Id.* at 582, 911 A.2d 427; *D'Angelo v. St. Agnes Healthcare, Inc.*, 157 Md.App. 631, 645, 853 A.2d 813 (2004).

A plaintiff can fail to file a proper certificate and report in many different ways, some being: when a certificate is not

---

claimant or plaintiff fails to file a certificate of a qualified expert with the Director attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury, within 90 days from the date of the complaint.

**14.** CJP § 3–2A–04(b)(4) provides:
A health care provider who attests in a certificate of a qualified expert or who testifies in relation to a proceeding before an arbitration panel or a court concerning compliance with or departure from standards of care may not devote annually more than 20 percent of the experts' professional activities to activities that directly involve testimony in personal injury claims.

filed, when a report is not attached to the certificate, *Walzer*, 395 Md. at 579, 911 A.2d 427, when the certificate does not clearly identify the defendant(s), *D'Angelo*, 157 Md.App. at 652, 853 A.2d 813, when the certifying expert does not meet the requirement of working or teaching in the same field as the defendant, *Breslin v. Powell*, 421 Md. 266, 299, 26 A.3d 878 (2011), and when the certificate or report does not clearly explain what standard of care was owed and how the defendants violated the standard, *Carroll v. Konits*, 400 Md. 167, 198, 929 A.2d 19 (2007).

Not only does an insufficient certificate or report require the court to dismiss the claim, the Court of Appeals has also interpreted the certificate requirement to be a condition precedent to filing a medical malpractice claim in circuit court. *Id.* at 181, 929 A.2d 19. As a condition precedent, "a failure to satisfy it can be raised at any time because the action itself is fatally flawed if the condition is not satisfied." *Id.* Thus, the Court has permitted a defendant to challenge a certificate or report for the first time after waiving arbitration and filing an answer and pretrial motions. *Kearney v. Berger*, 416 Md. 628, 653–54 (2010). Under the guidance of this case law, we turn to the issue raised by this case.

### D. Analysis

██ GBMC argues that the Barneses' expert report lacked any detail. It asserts that the report failed to specify the standard of care applicable to GBMC, did not explain how GBMC deviated from the standard of care, failed to state what should have been done to comply with the standard, and did not explain how GBMC caused Mr. Barnes' harm.[15] We

---

15. GBMC's argument was a bold one. The Act also requires *the defendant* to file a certificate of qualified expert and an expert report. CJP § 3–2A–04(b). The penalty for not filing is that, on the issue of liability, the claim may be adjudicated in favor of the plaintiff. *Id.* We see no reason why the requirements for the defendant's certificate and report would not be the same as the plaintiff's certificate and report. In this case, GBMC's qualified expert report was almost identical to the

understand that, based on the appellate courts' interpretations of the Act, those may have been deficiencies in the report and reasons to dismiss the case before the mistrial.[16] However, we conclude that dismissal was not required in this case, although for a slightly different reason than the circuit court articulated.

We express no view on whether GBMC was too late in filing and therefore waived any argument that the certificate requirement was not met, but instead find GBMC's challenge lacked merit because the hospital possessed Dr. Larsen's testimony and ample detail from the mistrial before the second trial. The trial testimony cured the report's apparent lack of detail because Dr. Larsen's testimony explained exactly what GBMC argued was absent from the expert report: the standard of care that was required of Nurse Stopa, how Nurse Stopa did not follow the standard of care, and how her failure to follow the standard led to Mr. Barnes' injury. Because

Barneses' report, with the exception of the expert's ultimate conclusions. It stated:

I have considered the information which you provided to me pertaining to David A. Barnes. It is my opinion, based upon that information and my background, training and experience, that the care rendered by the Defendant, Greater Baltimore Medical Center, Inc., conformed with the applicable standards of care, and that his medical condition was not affected adversely by any violation of the standards of care on the part of the Defendant.

Given GBMC's argument against the Barneses' expert report, if the Barneses had raised this issue in the circuit court, GBMC may have had a difficult time defending its own expert report.

16. We say this based on the case law, and not the bare text of the relevant statute, because the language of the statute requires dismissal without prejudice only when a certificate is not filed. CJP § 3–2A–04(b)(1)(i)(1). Also, the statute only requires that the certificate state that the defendant violated the standard of care and that the violation was the proximate cause of the plaintiff's injuries. *Id.* The Court of Appeals and this Court have interpreted this statute to require dismissal without prejudice when the certificate requirement (which includes the expert report) is insufficient in any way, *see infra* Section I.C., and interpreted the statute to mean that the expert must explain the appropriate standard of care, how it was violated, what standard show have been followed, and how the violation was the proximate cause of the plaintiff's injuries. *Id.*

there was a mistrial, the report and the testimony essentially became one. GBMC had the report and the testimony when it made its motion at the beginning of the second trial. Thus, it was proper for the judge to deny the motion to dismiss.

No previous appellate opinion *directly* addresses whether the Act allows for the possibility that subsequent events will cure an allegedly faulty report. Thus, we look to the Act and try to determine the intent of the legislature. *Mayor of Oakland v. Mayor of Mountain Lake Park*, 392 Md. 301, 316, 896 A.2d 1036 (2006). Analysis of a statute frequently requires consideration of the text, the purpose of the statute, and the consequences of the interpretation. To elaborate on each of these factors:

> Text is the plain language of the relevant provision, typically given its ordinary meaning, viewed in context, considered in light of the whole statute and generally evaluated for ambiguity. Legislative purpose, either apparent from the text or gathered from external sources, often informs, if not controls, our reading of the statute. An examination of interpretive consequences, either as a comparison of the results of each proffered construction or as a principle of avoidance of an absurd or unreasonable reading grounds the court's interpretation in reality.

*Buckley v. Brethren Mut. Ins. Co.*, 207 Md.App. 574, 584–85, 53 A.3d 456 (2012), *cert. granted,* 430 Md. 11, 59 A.3d 506 (2013).

The text of the statute only states that a case will be dismissed when a certificate is not filed without any further explanation. Because the statute is unclear on its application to the circumstances presented here, we can look to legislative purpose to determine whether a cure is permitted under the plain meaning of a statute. *See Breslin,* 421 Md. at 294, 26 A.3d 878. We conclude that the legislative purpose of the statute supports our conclusion that the Act permits a cure, at least under the facts of this case.

■ Finding that Dr. Larsen's testimony at the first trial, and before the beginning of the second trial, cured the alleged

deficiencies in his expert report serves the purpose of the certificate requirement. The purpose of the certificate requirement is to "weed out, shortly after suit is filed, non-meritorious medical malpractice claims." *D'Angelo*, 157 Md. App. at 645, 853 A.2d 813. Demanding that the plaintiff provide the defendant and the trial court with enough information to determine if the claim has merit and requiring the plaintiff to support his claim with an expert report help serve the purpose of the Act. *Kearney*, 416 Md. at 658, 7 A.3d 593. Accordingly, rejecting insufficient certificates and reports ensures that non-meritorious claims do not find their way to court.

For example, in *D'Angelo*, the plaintiff's certificate did not identify the medical professional(s) who had violated the standard of care. 157 Md.App. at 652, 853 A.2d 813. Thus, he did not provide enough information to support his claim, and it was properly dismissed. *Id.* Similarly, in *Carroll*, the Court of Appeals affirmed the dismissal of the plaintiff's case because the expert report did not provide the litigants with information on the appropriate standard of care and how it was violated. 400 Md. at 196–200, 929 A.2d 19; *See generally Walzer*, 395 Md. at 583, 911 A.2d 427 (finding the expert report "must explain how or why the physician failed or did not fail to meet the standard of care" because it would "help weed out non-meritorious claims and assist the plaintiff or defendant in evaluating the merits of the health claim or defense.").

Unlike *D'Angelo*, where the litigants and the court could not have known who the plaintiff had a claim against, or *Carroll*, where the defendant could not evaluate the plaintiff's claim because the expert report did not explain how the standard of care was violated, in this case, the Barneses had provided all the information necessary to evaluate their claims before trial. Dr. Larsen was directly examined and GBMC's attorney had cross examined him in the first trial regarding his reasoning of how GBMC's nurse violated the standard of care and why he believed those violations proximately caused Mr. Barnes' injuries. As a result of a mistrial, the litigants and the court had

more than the functional equivalent of a thorough expert report. With the testimony, the defendant and the court could evaluate the Barneses' claims before the second trial. Additionally, having Dr. Larsen testify in the mistrial forced the Barneses to support their claims with expert testimony before trial.[17]

In addition, it is our view that failure to recognize that the certificate's requirements had been fulfilled in this situation would have illogical consequences. We cannot imagine that the legislature that enacted the certificate requirement envisioned that a case would have to be retried when the only remedy is for the plaintiff to give the defendants something that they already had before trial. To look at the certificate and report in a vacuum would lead to an absurd and unreasonable reading of the statute when, in a case such as this, the requirement has already been satisfied, albeit in an unorthodox fashion.

Three years ago, Judge Joseph Murphy suggested that subsequent events may be able to cure an otherwise deficient certificate in his dissent in *Kearney*. In *Kearney*, the case went though the Health Claims Arbitration and Dispute Resolution Office ("HCADRO"), the defendant unilaterally waived arbitration, the plaintiff filed a complaint in circuit court, and the defendant filed an answer that generally denied the allega-

---

**17.** In *D'Angelo,* one of the plaintiff's arguments for why the case should not be dismissed was that the evidence obtained during discovery was sufficient to satisfy the "letter and spirit" of the certificate requirements of the Act. 157 Md.App. at 648, 853 A.2d 813. This Court said that the letter and spirit of the certificate requirement were not fulfilled because the depositions showed that the experts did not know who the plaintiff planned to sue. *Id.* Also, none of the experts ever expressed the view that any of the defendants violated the standard of care. *Id.* In its answer to the plaintiff's argument regarding whether a certificate could be cured, we stated that we never acknowledged that subsequent discovery by way of deposition testimony may be used to cure or supplement the certificate. *Id.* However, we ultimately determined that, nevertheless, the plaintiff's deposition did not name a proper defendant and therefore did not cure the certificate. *Id.* In this case, the testimony during the first trial provided the information lacking in the expert report, and because there was a mistrial the defendants had the information before the second trial began.

tions in the complaint. 416 Md. at 635, 7 A.3d 593. About eighteen months later, although prior to trial in the same case, the defendant filed a motion to dismiss based on numerous deficiencies in the certificate. *Id.* at 644, 7 A.3d 593. The Court of Appeals found the certificate insufficient because it did not include the expert report and did not discuss the standard of care or how it was violated. *Id.* at 650, 7 A.3d 593. Thus, the certificate could not be used to evaluate the plaintiff's claim that the doctor violated the standard of care. *Id.*

In its opinion, the majority did not discuss what information was revealed during discovery. Judge Murphy, however, felt that the case should have been reversed and remanded to determine whether discovery had already provided the defendant with all the information the certificate required. *Id.* at 669, 7 A.3d 593. He said that a case should not be dismissed for failure to file a sufficient certificate if the defendant had been provided with information equal in value to the certificate and expert report before moving to dismiss. *Id.* Our decision that Dr. Larsen's trial testimony cured any problems with a lack of detail in his expert report is consistent with Judge Murphy's reasoning but not inconsistent with the majority opinion because the majority was not presented with, and therefore did not discuss, whether discovery could have cured a deficient report. The *Kearney* Court did not know if the expert was even deposed. *See id.* at 634–637, 7 A.3d 593. Additionally, the litigants in *Kearney* had not passed the discovery phase, *see id.* at 666–67, 7 A.3d 593, whereas in this case, Dr. Larsen had already testified in front of a jury.

Our decision that trial testimony supplemented Dr. Larsen's report is also consistent with the defendant's right to raise the issue of an insufficient certificate or report at any time. We are not saying that after trial testimony the defendant has waived a right to challenge the certificate, we are merely concluding that, in this case, there was nothing to challenge. *See Witte v. Azarian,* 369 Md. 518, 533, 801 A.2d 160 (2002) (allowing the defendant to challenge the expert's ability to sign the certificate of qualified expert after the expert's trial testimony because the defendant believed that the testimony

showed the expert devoted more than twenty percent of his practice to activities directly involving testimony); *and Breslin,* 421 Md. at 273–74, 26 A.3d 878 (permitting a challenge to the certificate of qualified expert after expert's deposition because the expert did not have experience in the defendant health care provider's specialty).

Although we have already made clear that we express no view on whether GBMC's motion was filed too late, we do point out, as an aside, that the *Kearney* Court specifically declined to determine whether or not a party could ever waive its challenge to the certificate requirement. *Kearney,* 416 Md. at 658–60, 7 A.3d 593. We find this position hard to reconcile with the Court's opinion in *Carroll* that the requirement is a condition precedent that can never be waived. *Carroll,* 400 Md. at 181, 929 A.2d 19. However, were we to resolve the case on waiver grounds, if ever there was a case where a defendant has waived a challenge to the certificate requirement, this would be it. Here, the challenge was not raised for over six years. The claim was filed in 2005, the expert was deposed, he testified in the first trial in 2010, a mistrial occurred because of a snow storm, and yet GBMC never questioned the amount of information in the expert report— not in its answer, not during discovery, not in a pre-trial motion, and not during trial. GBMC raised the subject only on the eve of the second trial.

To be sure, we express no opinion on whether subsequent discovery or trial testimony can cure deficiencies other than the one at issue in this case. Indeed, our decision may have been different if there had not been a mistrial, if the defendant had made the motion to dismiss during the first trial, or if Dr. Larsen had not testified in the first trial.[18] In this case, however, we conclude that Dr. Larsen's testimony became part of his report, giving GBMC all the information required

---

18. In fact, it would be hard to cure the requirement that the expert have experience in the same field as the defendant or the requirement that the expert does not devote more than twenty percent of his work to activities involving testimony in malpractice cases. *See* CJP §§ 3–2A–02(c)(2)(ii), 3–2A–04(b)(4).

to be in the certificate before the start of the second trial. The circuit court was correct in denying GBMC's motion to dismiss.

## II. JNOV

### A. Standard to Grant JNOV

We review the circuit court's grant of a JNOV motion *de novo*. *See Univ. of Md. Med. Sys. Corp. v. Gholston*, 203 Md.App. 321, 329, 37 A.3d 1074 (2012). Thus, like the circuit court, we focus on whether the Barneses presented evidence that, taken in the light most favorable to the nonmoving party, legally supported their claim. *Elste v. ISG Sparrows Point, LLC*, 188 Md.App. 634, 645–46, 982 A.2d 938 (2009). The evidence legally supports a claim if any reasonable fact finder could find the existence of the cause of action by a preponderance of the evidence. *Hoffman v. Stamper*, 385 Md. 1, 16, 867 A.2d 276 (2005). In a jury trial, the amount of legally sufficient evidence needed to create a jury question is slight. *Id.* Thus, if the nonmoving party offers competent evidence that rises above speculation, hypothesis, and conjecture, the JNOV should be denied. *Aronson & Co. v. Fetridge*, 181 Md.App. 650, 664, 957 A.2d 125 (2008) (Internal quotation marks omitted). In determining the sufficiency of the evidence, the court must resolve all conflicts in favor of the nonmoving party. *Baltimore & O. R. Co. v. Plews*, 262 Md. 442, 449, 278 A.2d 287 (1971). Also, the court will assume the truth of all the nonmoving party's evidence and inferences that may naturally and legitimately be deduced from the evidence. *Id.*

### B. Causation

The Barneses' claim was for medical malpractice, which includes the elements of duty, breach, causation, and harm. *Gholston*, 203 Md.App. at 330, 37 A.3d 1074. The circuit court granted appellees' motions for JNOV based on insufficient evidence of causation for the claims against GBMC and Dr.

Rustia. Thus, we first discuss what type of evidence is sufficient to prove causation.

To prove causation, the Barneses had to establish that but for the negligence of the defendant, the injury would not have occurred. *Jacobs v. Flynn*, 131 Md.App. 342, 354, 749 A.2d 174 (2000). Because of the complex nature of medical malpractice cases, expert testimony is normally required to establish breach of the standard of care and causation. *Id.*

The expert testimony must show causation to a "reasonable degree of probability." *Id.* at 355, 749 A.2d 174. Reasonable probability exists when there is more evidence in favor of the causation than against it. *Id.* In *Franklin v. Gupta*, 81 Md.App. 345, 361, 567 A.2d 524 (1990), an expert testified regarding five instances where the standard of care had been breached and testified that the patient's condition would have been less likely to occur if the doctor would have followed the standard of care. *Id.* The expert concluded that "the events would have not occurred, or would have been less likely to have occurred...." *Id.* We held that this testimony satisfied the causation element. *Id.*

## C. Evidence of Causation

As to GBMC and Dr. Rustia, the Barneses presented expert testimony that Nurse Stopa breached the standard of care when she ignored the note from Dr. Halle (which stated that Mr. Barnes was experiencing a mini-stroke and needed a full stroke work up) and downgraded Mr. Barnes' priority so that he was sent to urgent care instead of the emergency department.[19] They also presented testimony that Dr. Rustia breached the standard of care when he failed to read Dr. Halle's note and failed to independently diagnose a mini-stroke.

---

**19.** Preliminarily, we note that the hospital acknowledges that Nurse Stopa was its employee. Accordingly, the hospital would be vicariously liable for any culpable negligence on Nurse Stopa's part. *See Barclay v. Briscoe*, 427 Md. 270, 282, 47 A.3d 560 (2012).

On causation, the Barneses presented the following evidence. Dr. Lamonte testified that under the standard of care applicable to all hospitals regarding the admission of acute neurologic emergency patients, any hospital would have admitted Mr. Barnes with the symptoms he had. In fact, she also testified that if Mr. Barnes would have been sent to the emergency department during his first visit to GBMC, he would have been admitted to that hospital.

Dr. Lamonte further testified that if Mr. Barnes had been admitted, his stroke would have likely been prevented for several reasons. First, the medical staff would have laid him flat and given him intravenous fluids and oxygen; second, further studies would have been done and revealed that he had carotid stenosis; third, the doctors would have performed an endarterectomy. According to Dr. Lamonte, the standard of care required these actions to be taken. GBMC's expert, Dr. Paul Nyquist, acknowledged that tests for a patient with a mini-stroke should be administered as quickly as possible, that Mr. Barnes' carotid artery had blood flow and was operable, and that an endarterectomy could have been performed to remove the partial blockage in his carotid artery.

GBMC contends that the Barneses did not prove that Nurse Stopa's negligence contributed to Mr. Barnes' injury. It argues that if Nurse Stopa would have sent Mr. Barnes to the emergency department, an emergency physician would have evaluated him. Instead, she downgraded his priority and sent him to urgent care, but two emergency physicians still evaluated Mr. Barnes. Thus, it asserts, her negligence did not affect the ultimate outcome. GBMC also argues that Nurse Stopa's negligence could not have changed the outcome because Mr. Barnes returned to the hospital for a stroke work up without a change in his condition. He then received the treatment he would have received if Nurse Stopa had sent him to emergency care during his first visit.

Assuming the truth of the Barneses' evidence and all reasonable inferences drawn therefrom, the jury could have concluded that Nurse Stopa downgraded Mr. Barnes' priority

and that this did contribute to Mr. Barnes' injury. The jury could have reasonably found that because she downgraded the priority and sent Mr. Barnes to urgent care, neither Dr. Rustia nor any other doctor was put on notice of the severity of Mr. Barnes' condition. The jury could have reasonably found that had the nurse sent Mr. Barnes to the emergency department with the highest priority, he could have been admitted during his first visit to GBMC and undergone a full stroke work up. It also could have concluded that Mr. Barnes did not receive the same treatment he would have received during the first hospital visit on the second because he was not admitted during the second visit so his stroke work-up could not be completed.

Dr. Rustia's contention centers on whether Mr. Barnes could have been admitted to the hospital. He concedes that Dr. Lamonte testified that Mr. Barnes' stroke would have been prevented if he had been admitted to the hospital, but Dr. Rustia argues that the Barneses did not produce any evidence that Mr. Barnes would have been admitted to the hospital if he had followed the standard of care. Dr. Rustia believes that it was undisputed that he could not have admitted Mr. Barnes himself. Instead, Dr. Rustia argues that appellees established that because of Mr. Barnes' insurance, only a Kaiser Permanente doctor could have authorized Mr. Barnes' admission to the hospital. Therefore, he argues, that Dr. Lamonte's testimony on whether Mr. Barnes would have been admitted lacks a factual basis, because the Barneses presented no evidence that a Kaiser Permanente doctor was available during Mr. Barnes' first visit to the hospital. Dr. Rustia further argues that Dr. Singh was the only available Kaiser Permanente hospitalist that day, and the Barneses did not establish that Dr. Singh was available when Dr. Rustia evaluated Mr. Barnes. Similarly, GBMC contends that even if Mr. Barnes would have been admitted to the hospital, Dr. Lamonte did not know what tests GBMC had available and thus, could not opine as to what tests and surgery Mr. Barnes would have undergone if he had been admitted to the hospital.

We conclude that Dr. Lamonte provided sufficient evidence to create a jury question on whether Mr. Barnes would have been admitted to the hospital and received the appropriate tests if Dr. Rustia and Nurse Stopa had complied with the standard of care. Dr. Lamonte testified that the standard of care required Mr. Barnes to be admitted to the hospital to have a full stroke work up. She testified that with Mr. Barnes' condition, he would have been admitted to any hospital. In fact, on cross examination, Dr. Lamonte stated that she was familiar with the admitting procedures at GBMC and that Mr. Barnes, under his condition, could have been admitted without a Kaiser Permanente hospitalist. Indeed, she testified that Dr. Rustia could have admitted him.[20] As to the tests available, Dr. Lamonte testified that although she did not know the intricate details of whether GBMC's medical equipment was working while Mr. Barnes was at the hospital, she knew the basic mechanics of what an emergency department would have to evaluate and treat a stroke patient.

This testimony rises above mere speculation and hypothesis that Mr. Barnes would have been admitted during his first visit and would have received the necessary tests. It is correct that Dr. Rustia and GBMC put forth testimony that Dr. Rustia could not have admitted Mr. Barnes and certain tests were not available in the evening. But when evaluating a motion for JNOV, a conflict like this one is resolved in favor of the nonmoving party, in this case, the Barneses. If the jury concluded that Dr. Lamonte was correct that Mr. Barnes would have likely been admitted, then the expert testimony of both Dr. Lamonte and GBMC's expert, Dr. Nyquist, sup-

---

**20.** Appellees argue that Dr. Lamonte was not permitted to testify to this fact, and the judge sustained objections to such testimony; however, the same testimony was repeated without objection on direct and cross examination. *See Old v. Cooney Detective Agency,* 215 Md. 517, 526, 138 A.2d 889 (1958) ("If the evidence is received without objection, it becomes part of the evidence in the case, and is usable as proof to the extent of whatever rational persuasive power it may have. The fact that it was inadmissible does not prevent its use as proof so far as it has probative value.").

ported the conclusion that Mr. Barnes' stroke would have been prevented if he had been admitted.

Dr. Rustia seems to suggest that the Barneses had to prove Dr. Singh was available during the first visit, but that would have been impossible. Indeed, Dr. Singh was "available" during the second visit: he answered his phone and was in the hospital. He just never arrived and evaluated Mr. Barnes. But we know from Dr. Abras' testimony that Mr. Barnes should have been admitted to the hospital. Thus, assuming the truth of all evidence and all inferences drawn therefrom in the light most favorable to the Barneses, the jury could have concluded that, had Nurse Stopa and Dr. Rustia followed the standard of care, Dr. Singh, another Kaiser Permanente doctor, or some other doctor would have admitted Mr. Barnes, and the doctors would have done a full stroke work up in compliance with the standard of care.

Appellees correctly point out that the jury found Dr. Abras provided adequate care the second time Mr. Barnes went to the hospital. Viewed in the light most favorable to the Barneses, we believe that this is irrelevant to the possibility that Nurse Stopa's and Dr. Rustia's negligence contributed to Mr. Barnes' later stroke. Although a Kaiser Permanente doctor did not arrive to admit Mr. Barnes during the second visit, Dr. Abras tried to have Mr. Barnes admitted, and the Barneses presented testimony that could have led the jury to conclude he would have been admitted during the first visit. Given this evidence, it was not "impossible"—as the appellees suggest—for the jury to find Nurse Stopa and Dr. Rustia's failure to follow the standard of care did proximately cause Mr. Barnes' stroke even though the doctor who treated Mr. Barnes during his second hospital trip, Dr. Abras, was not negligent.

We are mindful that our thoughts on the whether the burden of proof was met are irrelevant. The jury assessed and evaluated the weight to be assigned to the evidence presented to it and decided its effect. *Thodos v. Bland,* 75 Md.App. 700, 714, 542 A.2d 1307 (1988). We are not permit-

ted to substitute our evaluation of the evidence, for to do so would be an invasion of the jury's province. *Id.* For the reasons discussed, we conclude that the Barneses produced sufficient evidence of causation, and the court erred in granting a JNOV. Thus, we will exercise our power to reinstate the jury verdict. *See* Md. Rule 2–532.[21]

### III. Motion for Judgment

GBMC argues that even if the circuit court erred in granting the motion for JNOV, the error was harmless because there was not sufficient evidence for the case to be presented to the jury. Specifically, GBMC contends that there was insufficient evidence that Nurse Stopa breached the standard of care; there was insufficient evidence that Nurse Stopa's negligence caused Mr. Barnes' stroke; and Mr. Barnes assumed the risk of his injury when he chose to leave the hospital after a partial stroke work up.

The standard for granting a motion for judgment is legal sufficiency of the evidence, the same as a JNOV. *Orwick v. Moldawer*, 150 Md.App. 528, 531, 822 A.2d 506 (2003). GBMC argues that there was insufficient evidence that Nurse Stopa breached the standard of care because the Barneses' experts were relying on the "faulty assumption" that Nurse Stopa was the one who changed Mr. Barnes' priority and sent him to urgent care.

We find sufficient evidence of Nurse Stopa's negligence existed. Nurse Stopa acknowledged that the signature on the triage assessment form was hers. She also agreed that she

---

**21.** Md. Rule 2–532(f)(1) reads:

When judgment notwithstanding the verdict granted. If a motion for judgment notwithstanding the verdict is granted and the appellate court reverses, it may (A) enter judgment on the original verdict, (B) remand the case for a new trial in accordance with a conditional order of the trial court, or (C) itself order a new trial. If the trial court has conditionally denied a motion for new trial, the appellee may assert error in that denial and, if the judgment notwithstanding the verdict is reversed, subsequent proceedings shall be in accordance with the order of the appellate court.

was probably the triage nurse for Mr. Barnes. This is enough evidence for the experts to rely on in finding that it was Nurse Stopa who was negligent in changing Mr. Barnes' priority and sending him to urgent care. Additionally, the jury did not have to rely on the experts in deciding whether Nurse Stopa took the described actions. The jury heard Nurse Stopa's testimony. If the members of the jury did not believe that Nurse Stopa committed the actions based on her testimony, then they would have been free to find that the Barneses' experts were incorrect in concluding that the nurse breached the standard of care.

GBMC also contends that there was insufficient evidence of causation. Since we already addressed this issue in our discussion of the motion for JNOV, where our standard of review is also for sufficiency of the evidence, we will not revisit it here.

■ GBMC finally argues that Mr. Barnes assumed the risk of his injury and that the Barneses did not present legally sufficient evidence that a reasonable person would not have acted more prudently than Mr. Barnes. We decline to discuss this issue because GBMC did not raise this issue in its motions for judgment. Instead, it was only raised in the motion for JNOV. Therefore, this argument has not been preserved for appeal. *See* Md. Rule 2–532(a) ("[A] party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion."); *Kent Village Assocs. Joint Venture v. Smith,* 104 Md.App. 507, 516–17, 657 A.2d 330 (1995) ("Rule 2–519(a) requires that, in making a motion for judgment, the moving party 'shall state with particularity all reasons why the motion should be granted.' . . . Failure to state a reason 'with particularity' serves to withdraw the issue from appellate review."). Finding that the Barneses produced sufficient evidence of GBMC's breach of the standard of care and causation, and that GBMC did not preserve its assumption of the risk issue, we affirm the circuit court's denial of GBMC's motion for judgment.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED FOR REINSTATEMENT OF THE JURY VERDICT.   COSTS TO BE PAID BY APPELLEES.