REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 8

September Term, 2014

NYCOLE DAVIS, INDIVIDUALLY
AND AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF ASHLEY DAVIS,
A MINOR, AND JEROME BRADLEY

v.

BOARD OF EDUCATION
FOR PRINCE GEORGE'S COUNTY,
ET AL.

Eyler, Deborah S.,
Reed,
Salmon, James P.
       (Retired, Specially Assigned),

                                    JJ.

Opinion by Eyler, Deborah S., J.

Filed: April 3, 2015

On September 1, 2009, 13-year-old Ashley Davis was hit by a car as she was crossing the street to board a school bus. She died of her injuries two weeks later.

In the Circuit Court for Prince George's County, the appellants -- Ashley's mother, Nycole Davis, individually and as personal representative of Ashley's estate, and Ashley's father, Jerome Bradley -- filed a survival suit and wrongful death action, in negligence, against the Prince George's County Board of Education ("the Board"), the appellee.[1] The appellants alleged that the Board owed a duty of care to provide Ashley a bus stop on her side of the street, that the Board breached that duty, and that the breach proximately caused Ashley's injuries and death.

The case was tried to a jury, which found the Board negligent and awarded the appellants a total of $90,357,776.12 in damages.[2] The Board filed a motion for judgment notwithstanding the verdict ("JNOV"), which the appellants opposed. After a hearing, the court granted that motion and vacated the jury's verdict. It found that the Board did not owe Ashley a duty of care in tort and, even if it did, Ashley and Nycole were contributorily negligent as a matter of law. It further found that, if its grant of the JNOV motion were to be reversed on appeal, then, as to damages, the Board was immune from liability for damages over $100,000 under Md. Code (1974, 2006 Repl. Vol.), section 5-518 of the Courts and

---

[1]The appellants also sued the driver of the car that struck Ashley. That claim was settled and the driver was voluntarily dismissed with prejudice.

[2]The damages consisted of: $10,000 for funeral expenses; $3,000 for Ashley's pain and suffering; $344,776.12 in medical expenses; $50,000,000 in non-economic damages to Nycole; and $40,000,000 in non-economic damages to Jerome.

Judicial Proceedings Article ("CJ"), and therefore the judgment would be reduced to that amount; if CJ section 5-518 does not apply, the verdict shocked the conscience of the court and would be remitted to $166,000; and the judgment would further be reduced by $20,000, the amount paid in settlement of the appellants' claims against the driver who struck Ashley.

On appeal, the appellants ask whether these rulings were legally incorrect.[3]

## FACTS AND PROCEEDINGS

The facts adduced at trial, viewed in the light most favorable to the appellants, are as follows.

In August of 2009, Ashley was living in the Brinkley Manor Apartments ("Brinkley Manor"), at 3016 Brinkley Road, with Nycole's mother and grandfather (*i.e.*, Ashley's

---

[3] The questions as framed by the appellants are:
1. Did the Trial Court Err in Granting Defendant's Motion for Judgment Notwithstanding the Verdict?
2. Did the trial Court Err in Ruling that the Board of Education Owed No Duty to Plaintiff's Decedent, Ashley Davis?
3. Did the Trial Court Err in Ruling that the Decedent was Guilty of Contributory Negligence as a Matter of Law?
4. Did the Trial Court Err in Ruling that the Parents of the Decedent were Guilty of Contributory Negligence as a Matter of Law, and Imputing that Negligence to the Minor Decedent Contrary to Courts and Judicial Proceedings Article 10-910?
5. Did the Trial Court Err in Granting Defendant's Remittitur, Particularly When the Defendant Failed to File a Motion Therefor.

2

grandmother and great-grandfather).[4] Nycole and Jerome each had their own residences elsewhere. Nycole sometimes stayed with Ashley at Brinkley Manor.

Ashley was enrolled as a freshman in Crossland High School, in Temple Hills. The first day of school was August 24, 2009. Prior to the start of school, Nycole received a letter from the Prince George's County Public School system about school transportation for Ashley. It stated, as relevant:

> Students should use the bus stop to which they have been assigned, and must be at the stop approximately ten (10) minutes before the scheduled bus arrival time. Students should continue to wait at the stop until the bus arrives. Please be aware that it is common to experience an adjustment period the first few days as drivers, schools, and the students become familiar with new routes. Thus, during this period, buses may be slightly off schedule.

> \* \* \*

> The [bus assignment] information below is based on data provided by schools as of August 5, 2009. The route numbers or times may change somewhat as we receive new enrollment information from schools. You can view the latest bus stop information on our website (www.pgcps.org). Each school has a complete UPDATED list of bus assignments for every student, and personnel at the school will be available to answer your questions, or you can contact the Transportation Department at (301) 952-6570, or by e-mail at Transpor@pgcps.org. The e-mail will be monitored from 6 a.m. to 6 p.m. weekdays.

The letter identified Ashley's bus assignment. She was to ride Bus #674, which was scheduled to pick her up 7:09 a.m., in the parking lot at Brinkley Manor, next to the north side of Brinkley Road, where Ashley was living.

---

[4] In the court's opinion, it refers to Ashley's grandfather; however, Nycole testified that the man is her grandfather, and therefore he is Ashley's great-grandfather.

The only other nearby bus stop for Crossland High School students was directly across the street, on the south side of Brinkley Road, in front of the Brinkley House Apartments ("Brinkley House"). Bus #661 picked up students at that stop at 7:07 a.m.

On the first day of school, Ashley waited for Bus #674 at her assigned bus stop on the north side of Brinkley Road. The bus never came. Ashley's great-grandfather drove her to school that day, and she arrived late. Nycole learned of this on the day it happened, and thought that Ashley was supposed to take Bus #661, across Brinkley Road, in front of Brinkley House. Nycole testified:

> [F]or years there was only one bus for [Crossland High School students residing in] Brinkley Manor and Brinkley House and my cousin went to that school, other neighbors, other parents all affirmed the same thing that there was only one bus stop. So because the notice said Brinkley Manor I made her wait there. But when the bus didn't come then it, you know, it was just that there wasn't, there was only bus and plus the, the notice said that changes were subject to be made. So.

Nycole did not contact the school district with any issues concerning Bus #674. She acknowledged that "it was [her] decision" to have Ashley cross Brinkley Road to catch Bus #661, but explained that Ashley "didn't have a choice" because Bus #674 never came. In the past, Nycole had not allowed Ashley to cross Brinkley Road unaccompanied because the "road is dangerous." Before Ashley crossed Brinkley Road unaccompanied for the first time, Nycole told her "to please be careful."

Kendric Pringle also was a student at Crossland High School and also was assigned to Bus #674. Ashley's assigned bus stop at Brinkley Manor was the last stop on the route

4

before Bus #674 was to turn around and drive straight to the high school. Pringle's bus stop also was on the north side of Brinkley Road and was the one before Ashley's stop. Pringle testified that every day from the first day of school through the day of the accident Bus #674 turned around in a shopping center before the Brinkley Manor stop and drove straight to the high school. In other words, the bus driver did not go to the Brinkley Manor bus stop at all.

Tajuana Tate was the driver assigned to Bus #661. She had not been assigned that route before. She was given a routing list that showed where the bus stops were located and the number of children who were to get on the bus at each stop. She was not given a list of the children's names.

Tate testified that she arrived on time at the Brinkley House bus stop every day beginning on August 24, 2009, and that Ashley got on the bus at that stop. Although she recognized Ashley, Tate did not know her name and was unaware that she lived at Brinkley Manor, across Brinkley Road. Tate never saw Ashley crossing the street to get to the bus, and did not know that she was doing so. Tate answered affirmatively when asked if she "would have instructed [Ashley] not to [cross the street] and [would have] told the Transportation Department" of the Board if she had known that Ashley was crossing Brinkley Road to take Bus #661. Tate did not witness the accident.

Larry Walker and Jesse Strange were students at Crossland High School. They witnessed the accident, and their versions of what happened essentially were the same. The weather was sunny and clear. As Ashley walked from her apartment to Brinkley Road, she

was talking on her cell phone. When she reached the curb, before entering the street, she put her phone in her purse and looked both ways. There were no vehicles in view coming from either direction. Ashley proceeded to walk across the westbound lanes of Brinkley Road. As she reached the center line, but before stepping into the eastbound lanes, a car driving east struck her.

Tammi Morris is employed by the Board in its Transportation Department. She is in charge of bus scheduling. She testified that the Board has a "block policy," which is a computer generated route established for buses. The block policy in effect at the time of the accident established a bus stop on the north side of Brinkley Road, in the Brinkley Manor parking lot, and on the south side of Brinkley Road, in front of Brinkley House. There were bus stops established on both sides of Brinkley Road because it was a busy road and was not safe for children to cross. Morris testified that the bus driver assigned to Bus #674 would have been violating the block policy if he failed to go to the Brinkley Manor bus stop to pick up children. She also testified that it would be a violation of the Board's policies for a bus driver to create a situation in which a student was not able to board a bus assigned to her side of the street, but would have to cross the street to take a bus to school.

Morris testified that, although the Board's handbook for bus drivers said that they should know the students assigned to their bus routes by name, and should greet them, the bus drivers on the large school buses, *i.e.*, all of them except buses for special education students, were not given lists of the names of the students assigned to their routes. She

6

explained that in times past the bus drivers had been given a list of names. When the bus routing was changed to the "block policy," through application of a computer program, that was changed, in part because there can be transfer or other students who are permitted to ride to school on buses, but are not actually assigned to a particular bus, and the bus drivers still should allow them on the bus and not leave them behind.

Andrew Ramisch testified for the appellants as an expert in accident reconstruction. He opined that Brinkley Road is a four-lane highway and that, pursuant to COMAR 13A.06.07.13C, the Board was required to have buses pick up and discharge students on both sides of that street, so they would not have to cross the street to get the bus to school or to return home from school. He further opined that if a bus driver repeatedly fails to drive to a bus stop on his assigned route, that is tantamount to there not being a bus stop at that location at all. Based on the facts in evidence, Ramisch opined that that is what happened here. The driver for Bus #674 repeatedly failed to go to the Brinkley Manor bus stop, instead turning around before reaching that stop. That was the equivalent of there not being any bus stop at Brinkley Manor.

The case was sent to the jury on a special verdict. The jurors found that "the Board...was negligent and that its negligence was a proximate cause of [Ashley's] accident"; Ashley was not contributorily negligent; and Ashley did not assume the risk of her injury. They awarded damages of $90,357,776.12.

7

On April 12, 2013, the court entered judgments in accordance with the verdict. Four days later, the Board filed a motion for JNOV, in which it argued that it did not owe a legal duty of care to Ashley; that Ashley was contributorily negligent as a matter of law; and that Ashley had assumed the risk of her injuries as a matter of law. It also argued, alternatively, that the amount of the verdict was "shocking, grossly excessive and inordinate" and that the verdict should be reduced because the Board's liability was limited to $100,000 by CJ section 5-518. The appellants filed an opposition, arguing that the Board "owed a duty to Ashley Davis to provide a safe bus stop and safe transportation services," and breached that duty by failing "to provide safe transportation services" and because Ashley "was not picked up on her side of the roadway"; and that contributory negligence and assumption of the risk were issues that were properly submitted to the jury for decision.

On July 26, 2013, the court held a hearing on the Board's motion for JNOV. The court granted the motion by a memorandum opinion and order entered on February 25, 2014. As we have explained, the court ruled:

1) the Board did not owe Ashley a duty of care in tort;
2) if the Board did owe Ashley a duty of care, Ashley and Nycole were contributorily negligent as a matter of law;
3) if the court's rulings on duty and contributory negligence were to be reversed on appeal, then as to damages:
    a) under CJ section 5-518, the board is immune from liability for damages above $100,000;
    b) if CJ section 5-518 does not apply, the verdict shocked the conscience of the court in any event, and would be reduced to $166,000; and

8

c) the judgment against the Board would be reduced by $20,000, the amount the appellants received from the driver of the car that struck Ashley, in settlement of their claims against her.

This timely appeal followed.

Additional facts will be included in our discussion, as necessary.

## STANDARD OF REVIEW

In reviewing the circuit court's grant of a motion for judgment notwithstanding the verdict, we

> must resolve all conflicts in the evidence in favor of the plaintiff and must assume the truth of all evidence and inferences as may naturally and legitimately be deduced therefrom which tend to support the plaintiff's right to recover -- that is, the evidence must be viewed in the light most favorable to the plaintiff.

*Houston v. Safeway Stores, Inc.*, 346 Md. 503, 521 (1997) (internal quotation marks and citation omitted). "Only where reasonable minds cannot differ in the conclusions to be drawn from the evidence, after it has been viewed in the light most favorable to the plaintiff, does the issue in question become one of law for the court and not of fact for the jury." *Id*. (internal quotation marks and citation omitted).

## DISCUSSION

### I.

### Duty of Care

The appellants contend that pursuant to COMAR 13A.06.07.13C, the Board's own internal policies, and the common law, the Board owed Ashley a duty to provide a bus stop

on her side of the street so she could take the bus to school without endangering herself by crossing a busy street. The Board counters that the "[a]ppellants have failed to articulate any legally cognizable duty under Maryland statute, regulation, or common law that was triggered by the uncontroverted facts in this case." It urges this Court to adopt a common law "physical custody-notice rule," and hold that "the Board owed no duty to [Ashley]" because at the time of the accident, "[(1)] she was not in the *physical custody or control* of the Board, and because [(2)] the Board had no *notice* of problems with [Ashley]'s assigned bus picking her up at her assigned bus stop." (Emphasis added.)

> To prevail on a cause of action in negligence, the plaintiff must prove:
>
> (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.

*Hemmings v. Pelham Wood Ltd. Liability Ltd. Partnership*, 375 Md. 522, 535-36 (2003) (internal quotation marks and citations omitted). "Generally, whether there is adequate proof of the required elements needed to succeed in a negligence action is a question of fact to be determined by the fact finder." *Valentine v. On Target, Inc.*, 353 Md. 544, 549 (1999). However, whether the defendant was under a legal duty to protect the plaintiff from injury is a question of law. *Id.* at 549 ("[T]he existence of a legal duty is a question of law to be decided by the court."). *See also Pendleton v. State*, 398 Md. 447, 461 (2007). When "the trial court decision turns on a question of law, not a dispute of fact, we review the trial court's decision for legal correctness without deference." *Blackburn Ltd. P'ship v. Paul*, 438

10

Md. 100, 108 (2014) (citing *Mathews v. Cassidy Turley Maryland, Inc.*, 435 Md. 584, 598 (2013)).

Under the judicially created "Statute or Ordinance Rule," statutes, ordinances, and regulations can create a "statutory duty" of care that is enforceable in negligence. *See Blackburn*, 438 Md. at 111-15. "[T]he statute or ordinance allegedly violated [must] 'set forth mandatory acts' that are 'clearly for the protection of a *particular* class of persons' and *not* merely for the 'the public as a whole.'" *Wietzke v. Chesapeake Conference Ass'n*, 421 Md. 355, 388 (2011) (quoting *Remsburg v. Montgomery*, 376 Md. 568, 584 (2003)) (emphasis in original).

The Statute or Ordinance Rule may apply even when contrary common law duty principles exist. *See Blackburn*, 438 Md. at 112-13 ("This Court . . . [has] observ[ed] that common-law limitations on the duty owed to trespassers were 'inapplicable' in a case 'based on the Housing Code, not the common law.'" (quoting *Allen v. Dackman*, 413 Md. 132, 157 (2010))). COMAR provisions fall within the Statute or Ordinance Rule. *See Blackburn,* 438 Md. 100 (holding that an apartment complex owner owed a "statutory duty" to a three-year-old boy who nearly drowned in a pool based on a COMAR provision requiring that fences around pools not allow passage of a sphere four inches in diameter).

"At its own expense, a county governing body may provide transportation for public school students." Md. Code (1978, 2008 Repl. Vol.), section 7-801(b)(1) of the Education Article ("EA"). The State Board of Education must "adopt rules and regulations that provide

11

for the safe operation of the student transportation system of each county board of education." *Id.* at § 5-205(f). In accordance with this directive, the State Board of Education adopted COMAR 13A.06.07.13, titled "Routing and Operating Procedures." Subsection A states: "The prime consideration is the safety of riders." Additionally, subsection C states: "On four-lane highways students, *shall* be picked up and discharged on the side of the roadway where they reside." (Emphasis added.)

As noted, the appellants maintain that COMAR 13A.06.07.13C created a duty of care under the Statute or Ordinance Rule. We agree. Subsection C is not a regulation designed for the protection of the public as a whole. Rather, it is designed to protect public school students who ride county-provided buses to and from school from the risks associated with crossing a four-lane highway, including the risk of being hit by a car. Therefore, COMAR 13A.06.07.13C creates a statutory duty owed by a county board to its students to provide bus stops on four-lane highways in locations so that students do not need to cross those highways to take the bus.

If Brinkley Road is a four-lane highway, then pursuant to COMAR 13A.06.07.13C the Board owed a duty of care to students such as Ashley to provide bus stops on both sides of Brinkley Road, so they would not have to cross Brinkley Road to take the bus to school (or to return home from school). There was evidence that Brinkley Road in fact was a four-lane highway at the time of the accident. The appellants' expert, Andrew Ramisch, a civil engineer specializing in "highway traffic safety and traffic engineering, accident analysis and

12

reconstruction," was qualified as an expert in the field of "traffic highway safety and with respect to the standard of care for the location of safe bus stops." Ramisch opined that, based on its 22 foot width from the curb to the center line, Brinkley Road was "a four lane highway the way it's marked."[5]

As a public school student living on a four-lane highway, in a school district in which the Board had taken it upon itself to provide bus transportation to school, Ashley was within the specific class of people that COMAR 13A.06.07.13C was designed to protect. And she suffered precisely the kind of injury that that regulation was intended to protect against. Accordingly, the Board owed Ashley a legal duty of care to provide a bus stop on her side of Brinkley Road sufficient to support the duty element of a cause of action in negligence. For this reason, the circuit court erred in granting a JNOV in favor of the Board on the ground of an absence of a legal duty of care.[6]

## II.

## Contributory Negligence

### (A)

---

[5] Specifically, "a lane width of 11 feet on an arterial roadway such as Brinkley would be common" and therefore Brinkley Road was wide enough to accommodate four lanes of traffic. It did not matter that the only markings on Brinkley Road were two solid yellow lines dividing the street in half.

[6] As recited above, there was evidence that Bus #674 never made a stop on the north side of Brinkley Road at the Brinkley Manor location, and that that was tantamount to the Board's not establishing a bus stop at that location at all. The Board does not argue that this was legally insufficient evidence of a breach of the duty of care created by COMAR 13A.06.07.13C.

The appellants contend the circuit court "erred in ruling that [Ashley] was guilty of contributory negligence as a matter of law." They offer two reasons: first, the Board "waived the issue" by "fail[ing] to raise contributory negligence as a basis of [its] motion for judgment"; and second, Ashley was not contributorily negligent as a matter of law because "a reasonable juror could infer that [she] thought that [Brinkley Road] was clear, attempted to cross the roadway and was struck while she stood on the center line." We agree with the appellants on both counts.

Rule 2-532 governs JNOV motions. In relevant part, it provides that

> [i]n a jury trial, a party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence and *only on the grounds advanced in support of the earlier motion*.

Md. Rule 2-532(a) (emphasis added). Under Rule 2-519(a), a party who moves for judgment "shall state with particularity all reasons why the motion should be granted. . . ." "Failure to state a reason 'with particularity'" in a motion for judgment precludes raising an argument on those grounds in a motion for JNOV, and consequently "serves to withdraw the issue from appellate review." *Kent Village Assocs. Joint Venture v. Smith*, 104 Md. App. 507, 517 (1995) (citing *State v. Lyles*, 308 Md. 129 (1986)) (additional citation omitted). *See also Barnes v. Greater Baltimore Medical Center, Inc.*, 210 Md. App. 457, 487 (2013).

In this case, in moving for judgment, the Board articulated in detail its arguments about the duty of care and about assumption of the risk. It did not make any argument, particular or not, in favor of judgment on the basis of contributory negligence as a matter of

14

law.  The only time the Board mentioned "contributory negligence" was when it was urging

the court to find assumption of the risk as a matter of law:

> [BOARD'S COUNSEL]:  Yes.  That in fact all of these attributes suggest that she knew or should have known that she was taking a risk when she chose to cross Brinkley Road in the middle of the road with the sun being a hindrance and I believe that the case of Oddis, O-D-D-I-S, versus Green, at 11 Maryland Appellate 153, 1971 case, it involved an 11-year-old bicyclists [sic] who was hit when he failed to yield a right-of-way and the Court in that case said the minor bicyclist who was 11 years of age, was old enough to be bound by rules of the road and that was where they found contributory negligence.  By failure to yield the right-of-way upon entry from an unfavored street into a favorite highway.

> THE COURT:  You may argue contributory negligence, but contributory negligence is a matter of fact —

> [BOARD'S COUNSEL]: I understand.  I was just articulating to the Court that that was a contributory negligence case.

> THE COURT:  Right.

> [BOARD'S COUNSEL]: In the other case that I would point the Court's attention to is Brown versus Rodgers, 19 Maryland Appellate 562, a 1974 case, which provides a Court of Special Appeals under the statute giving pedestrian preference in crosswalk, pedestrian must still exercise due care in crossing to avoid injury and cannot cross blindly without looking for approaching traffic and may not leave curb or place of safety or walk or run into a path of a vehicle which it is so close that it is impossible for the driver to yield.
> That is what we are talking about here.  We are talking about an unfortunate decision made by a young person to go to the street where she was in the path where it was impossible for the driver to yield.  And that was the assumption of the risk.

> THE COURT:  Okay.  Anything else?

> [BOARD'S COUNSEL]:  No, Your Honor.

15

This brief reference to contributory negligence was merely to point out that a case the Board's lawyer was arguing in favor of assumption of the risk was a contributory negligence case.

The Board argues that even if there were a "procedural error" on its part, the appellants were "on notice" of the contributory negligence argument because the Board "**consistently** argued that [Ashley] was contributorily negligent in its Answer to Complaint, Answer to Amended Complaint, and in all four of its dispositive motions presented to the [c]ourt." (Emphasis in original.) Any arguments the Board made before and after its motion for judgment are irrelevant. Rule 2-532(a) allows a party to move for JNOV "only on the grounds advanced in support of the" motion for judgment. Because the Board did not argue contributory negligence in support of its motion for judgment, it was precluded from raising that argument in a motion for JNOV. For that reason alone, the trial court erred in granting the JNOV motion on the ground of contributory negligence.

Even if the Board had argued contributory negligence when it moved for judgment, we would conclude that the trial court erred in granting the Board's motion for JNOV on that basis.

The court's contributory negligence ruling was specific. It concluded that the evidence at trial established that Ashley had moved from a place of safety into the path of a moving vehicle, and therefore was contributorily negligent as a matter of law. It pointed out that a crosswalk was located less than a tenth of a mile from where Ashley attempted to cross

16

the street and that, pursuant to Md. Code (1977, 2009 Repl. Vol.), section 21-503(a) of the Transportation Article, a pedestrian crossing a street at a point other than a marked crosswalk or an unmarked crosswalk at an intersection must yield the right of way to any vehicle approaching on the roadway.

In making its ruling on contributory negligence, the court failed to view the facts adduced at trial in the light most favorable to the appellants. As recited above, those facts were that, before crossing Brinkley Road, Ashley got off her cell phone and put it in her purse; she looked both ways to see if traffic was coming from either direction; and no cars were in sight. She crossed the westbound lanes of Brinkley Road and, upon reaching the center line, and before entering the lanes for eastbound traffic, was struck by a car headed east on Brinkley Road. On these facts, the issue of contributory negligence on Ashley's part plainly was a jury question. Reasonable jurors, crediting the evidence most favorable to Ashley, could have found that she was paying attention as she attempted to cross Brinkley Road and that she did not put herself in the path of the vehicle that struck her; rather, that vehicle crossed the center line and hit her. Reasonable jurors also could have found that Ashley did not fail to yield the right of way when crossing outside a crosswalk because there was no vehicle to which to yield when she started crossing and the vehicle that then appeared and struck her drove outside its lane of traffic, so yielding would have made no difference.

Interestingly, on the crosswalk issue, the Board relies on *Pratt v. Coleman*, 14 Md. App. 76 (1972), which does not support its position. In that case, we held "that a pedestrian

17

who crosses a street between crossings is not negligent *per se*," but "when he undertakes to do so, [he must] use the greatest of care to protect himself from injury." *Id.* at 80. Likewise, in *Lewis v. Hammond*, 247 Md. 297, 302 (1967), the Court of Appeals held that "'[a] pedestrian who crosses a thoroughfare [between street crossings] is not *prima facie* guilty of negligence, nor does it make [her] presumptively negligent; it is but a circumstance to be considered along with all other relevant facts in the case on the question of [her]. . . contributory negligence." (Citation omitted.) It is clear, then, that not using a crosswalk did not make Ashley contributorily negligent as a matter of law.

Where Ashley was located when she was struck was a question of fact, which is why the issue of contributory negligence properly was submitted to the jury for decision in the first place and why the circuit court erred in granting the JNOV based on contributory negligence.

**(B)**

The circuit court also ruled that Nycole was contributorily negligent as a matter of law for not notifying the school that Ashley's bus was not coming to her bus stop and for allowing Ashley to cross the street unaccompanied. The appellants contend this issue was not raised by the Board in moving for judgment at the close of the evidence, and therefore was not a proper ground on which the court could grant a JNOV motion; and that the court's ruling was in error in any event. The Board does not address the issue of contributory negligence on the part of Nycole in its brief.

18

The appellants are correct that the issue of contributory negligence on the part of Nycole was not argued by the Board in its motion for judgment and therefore was not a proper ground for the court to grant the Board's JNOV motion. Moreover, contributory negligence of Nycole was not an issue in the case at all. The jury only was asked to determine whether Ashley was contributorily negligent. And, in its JNOV motion, the Board's only argument regarding contributory negligence of Nycole was that, because Ashley was contributorily negligent as a matter of law, her parents were barred from recovering. It made no argument that Nycole was herself negligent.

For these reasons, we conclude that the issue of contributory negligence of Nycole was not properly before the court on the JNOV motion. And, in any event, the only argument advanced in that motion -- that Nycole (and Jerome) could not recover because Ashley was contributorily negligent -- was not meritorious because, as we have explained, Ashley was not contributorily negligent as a matter of law.

## III.

## Damages

As noted, the court made two alternative rulings on damages, in the event its grant of the JNOV motion on liability were to be reversed on appeal. It ruled that under EA section 4-105 and CJ section 5-518, the jury's verdict would be reduced to $100,000. Alternatively, if those statutes do not apply, the amount of the verdict -- more than $90 million dollars -- shocked the conscience of the court and would be reduced to $166,000, an amount the court

19

found not to be shocking. Finally, the court ruled that the amount of any verdict would be reduced by $20,000, which was the sum paid by the driver of the car that struck Ashley in settlement of the claims made against the driver.

The appellants challenge all of these rulings on appeal.

**(A)**

The appellants contend, for four reasons, that the court erred in reducing the verdict to $100,000 under the partial waiver of sovereign immunity granted to county boards of education by EA section 4-105 and CJ section 5-518. First, the issue was not raised in the Board's motion for judgment at the close of the evidence, and therefore was waived. Second, the JNOV rule does not allow for a reduction of damages by the court, including a reduction pursuant to these statutes. Third, the court incorrectly ruled that it was the appellants' burden to prove the Board was not entitled to have the verdict reduced on the ground of partial sovereign immunity, when actually it was the Board's burden to prove that it was entitled to such a reduction. And finally, the Board failed to adduce evidence to meet that burden.

EA section 4-105 provides at subsection (b) that the State Board of Education shall establish standards for insurance policies, including minimum liability coverage of $100,000. Under subsection (c),

(1) A county board complies with this section if it:
(i) Is individually self-insured for at least $100,000 for each occurrence under the rules and regulations adopted by the State Insurance Commissioner; or
(ii) Pools with other public entities for the purpose of self-insuring property or casualty risks under Title 19, Subtitle 6 of the Insurance Article.

20

That subsection goes on to require a county board that self-insures to periodically file the terms and conditions of the self-insurance in writing with the State Insurance Commissioner. Those terms and conditions are subject to the approval of the State Insurance Commissioner and "[s]hall conform with the terms and conditions of comprehensive liability insurance policies available in the private market." EA § 4-105(c)(3)(ii). At subsection (d), the statute states that "[a] county board shall have the immunity from liability described under § 5-518 of the Courts and Judicial Proceedings Article."

CJ section 5-518 is titled "Immunity -- County boards of education." It provides in relevant part:

> (b) *Claims for more than $100,000.* --- A county board of education . . . may raise the defense of sovereign immunity to any amount claimed above the limit of its insurance policy or, if self-insured or a member of a pool described under § 4-105(c)(1)(ii) of the Education Article, above $100,000.

> ( c) *Claims for $100,000 or less.* --- A county board of education may not raise the defense of sovereign immunity to any claim of $100,000 or less.

A county board of education is a state agency. *Beka Indus., Inc. v. Worcester Cnty. Bd. of Educ.*, 419 Md. 194, 210 (2011). In the absence of CJ section 5-518, a county board would be immune from suit under the doctrine of sovereign immunity. *Bd. of Educ. of Baltimore Cnty. v. Zimmer-Rubert*, 409 Md. 200, 205-06 (2009). CJ section 5-518(c) waives the defense of sovereign immunity for county boards for all tort claims of $100,000 or less. *Id*. at 215-17. *See also Bd. of Educ. of Worcester Cnty. v. Beka Indus., Inc.*, 190 Md. App. 668, 7076 (2010), *rev'd in part on other grounds*, *supra* (holding that the legislative waiver

of the defense of sovereign immunity in CJ section 5-518 is only with respect to tort claims).

Under CJ section 5-518(b), for a claim in which more than $100,000 is sought, a county board may raise the defense of sovereign immunity for any amount above the limits of its insurance policy (*i.e.*, when the limits exceed $100,000), if it has a covering insurance policy; or, if self-insured or a member of an insurance pool as described in EA section 4-105, for any amount above $100,000.

The appellants' first two arguments are intertwined. As they point out, under Rule 2-532, which governs motions for JNOV, "[i]n a jury trial, a party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion." Md. Rule 2-532(a). Also, the appellants are correct that the case law is well-established that the purpose of a motion for JNOV is to set aside a verdict on the ground that it is not legally viable. The motion is not a proper vehicle for reducing or increasing the jury's verdict. *See Mona v. Mona Elec. Group, Inc.*, 176 Md. App. 672, 711 (2007) (citations omitted). So, the appellants maintain that because the Board did not argue in its motion for judgment that a verdict against it might (depending on its amount) have to be reduced pursuant to CJ section 5-518, it could not make that argument in the JNOV motion.

In our view this argument overlooks the principle that this Court and the Court of Appeals have followed, that courts are to consider motions based on their content, not on how they are titled.

22

> Under Maryland law, when motions and other pleadings are considered by a trial judge, it is the **substance** of the pleading that governs its outcome, and not its **form**. In other words, the nature of a motion is determined by the relief it seeks and not its label or caption.

*Hill v. Hill*, 118 Md. App. 36, 44 (1997) (emphasis in original). *Accord Montgomery Cnty., Maryland v. Fraternal Order of Police, Montgomery Cnty. Lodge 35, Inc.*, 427 Md. 561, 569-70 (2012).

To be sure, the motion in question is titled "Motion for Judgment Notwithstanding the Verdict." And most of the arguments advanced in it challenge the verdict against the Board on liability, and do so on legal grounds, as a motion for JNOV is supposed to. The motion also contains alternative arguments on damages that do not concern the issue of failure of proof, however. Specifically, as to the sovereign immunity issue, the Board asserted: "Should the Court decide to accept the jury verdict for [the appellants], it must reduce the award" because "the jury's verdict exceed[s] the cap on damages for a county board of education" and "[t]he Board . . . is immune as to damages claimed in excess of $100,000.00, the amount of its self-insurance."[7]

The substance of the motion is one for a JNOV on liability and, in the alternative, for a reduction of the amount of the verdict pursuant to CJ section 5-518. It was not necessary, therefore, for the Board to raise the issue of a reduction of the verdict in a motion for judgment at the close of the evidence. Indeed, there would have been no point in making an

---

[7]The motion also includes an argument that the verdict should be reduced because it shocks the conscience. We shall address that issue *infra*.

23

argument about CJ section 5-518 in a motion for judgment, because the statute only comes into play when a verdict has been returned for the plaintiff and the verdict is for an amount over $100,000.

In fact, immunity under CJ section 5-518 was raised by the Board below, prior to its filing the JNOV motion, in its answer. In addition, it was brought up by counsel for the Board on the second day of trial. At that time, during a discussion among the court and counsel about the proposed verdict sheet, the Board's lawyer said she was "noting for the record that as [she understood] the liability for the Board . . . under Article 5-518 Courts and Judicial Proceedings and Education Article 4-105, the total liability is $100,000 . . . ." The trial judge responded by assuring her that "post trial [he would] listen to anything [she] ha[d] to say on that." Thus, the issue was raised and the judge expressly, and reasonably, said he would not address it until after the conclusion of the trial, when the verdict would be known.[8]

As mentioned, the appellants also argue that the court erred in reducing the verdict to $100,000 pursuant to CJ section 5-518 because the court incorrectly placed the burden on them to show that the Board did not have insurance that would entitle it to the defense of sovereign immunity and the Board did not present proof of its insurance coverage. These

---

[8] We note that, even if the defense of sovereign immunity had not been raised at all below, we still could consider it, because it "can be raised at any time, even 'for the first time on appeal.'" *Beka Indus.*, *supra*, 190 Md. App. at 691 (quoting *Dep't of Pub. Safety & Corr. Servs. v. ARA Health Servs.*, 107 Md. App. 445, 459 (1995), *aff'd*, 344 Md. 85 (1996) (additional citation omitted)).

24

arguments need to be put in context, because they do not track what happened during the hearing on the JNOV motion.

At the hearing, the appellants gave the court a letter their lawyer had received from the Maryland Insurance Administration (MIA). The appellants' lawyer had written to the MIA, making a Maryland Public Information Act request for copies of all documents reflecting, concerning, or referring to the terms and conditions of the self-insurance, specifically comprehensive general liability insurance, filed by or on behalf of the Board, and in effect as of September 1, 2009. The letter from the MIA was in response to that request. It stated that "[t]he Property and Casualty Section of the [MIA] does not possess any information that is responsive to your request." The appellants argued to the court that the letter from the MIA established that the Board had not complied with the filing requirements of EA section 4-105, and therefore was not entitled to the immunity set forth in CJ section 5-518. The appellants also argued that the letter established that the Board did not have any liability insurance, and for that reason as well did not comply with EA section 4-105 and was not entitled to immunity under CJ section 5-518. In addition, the appellants made the separate argument that to be entitled to immunity under CJ section 5-518, the Board had to call a witness or introduce evidence of some sort to prove that it had insurance and the limits of its insurance.

Counsel for the Board responded that the letter from the MIA did not establish that the Board had failed to make filings as required by EA section 4-105 or that it did not have

25

insurance. She explained that the Board, together with other county entities, the lead among which is the County itself, belongs to a self-insurance pool; and the County makes whatever periodic filings are required. Therefore, the MIA's letter stating that there were no documents responsive to the appellants' request did not mean that the filings that were required to be made had not been made or that the Board did not have insurance. She pointed out that the letter may well have meant that the appellants' counsel's request was not directed to the proper entity.

Counsel for the Board did not specifically respond to the appellants' argument that the Board was required to put on evidence to prove the type and amount of insurance it had, assuming it had insurance. She seemed to maintain that the court could take judicial notice that the Board was part of a insurance pool of Prince George's County government entities, based on her representation to that effect.

In its memorandum opinion, the court found that the letter from the MIA was not sufficient for the appellants to show that the Board had not complied with the filing requirements of EA section 4-105. The court commented that the phrase "periodically shall file with the State Insurance Commissioner" is unclear, in that it does not specify when the filings must be made, and that the letter does not show that a filing had to have been made by the Board itself, as opposed to by some other entity with which the Board is insured. The court concluded that, to the extent the appellants were trying to show that the Board did not have the immunity conferred by CJ section 5-518 because it had not complied with the filing

26

requirements of EA section 4-105, the appellants had the burden of producing evidence to show that, and they had failed to do so. The court did not address the appellants' argument that to prove the amount and nature of its insurance, the Board had to call a witness or present evidence of some sort. It implicitly rejected the argument, however, in that it reduced the judgment to $100,000 under CJ section 5-518, seemingly accepting the representation by the Board's counsel that the Board was in a self-insurance pool as sufficient to establish that fact.

The appellants' argument conflates the court's rulings. The court did not rule, as the appellants maintain, that the burden was on them to prove that the Board lacked insurance. Rather, the court ruled that if the appellants were taking the position that the Board had lost its right to CJ section 5-518 immunity by failing to make filings with the MIA, the appellants bore the burden of proving that. In other words, the court concluded that, to receive the benefit of immunity under CJ section 5-518, the Board did not first have to prove that it had complied with the filing requirements of EA section 4-105. This ruling was legally correct.

We agree with the appellants, however, that the burden was on the Board to present evidence of the existence and nature of its insurance, *i.e.*, whether it had an insurance policy, and the limits of any such policy, or whether it was self-insured or part of an eligible insurance pool. If the Board had its own policy, the policy limit would be the amount above which the Board could assert sovereign immunity, under CJ section 5-518. If the Board was self-insured or part of a pool, it could assert sovereign immunity under CJ section 5-518 for

27

damages over $100,000.  There was no evidence presented on this issue, however.  Because

sovereign immunity can be raised at any time, *see supra* n.7, the proper disposition is a

remand for the court to hold a hearing and consider evidence about the existence and nature

of the Board's insurance as applicable to the accident in this case.  If the evidence shows that

the Board was privately insured with limits above $100,000, then the verdict should be

reduced to the amount of the policy limit.  If the evidence shows that the Board was self-

insured or part of a pool, the verdict should be reduced to $100,000.  If the evidence shows

that the Board did not have any insurance at all, the verdict should not be reduced pursuant

to EA section 4-105 and CJ section 5-518.

**(B)**

As noted, the appellants contend the trial court erred in its second alternative ruling

regarding damages:  that if EA section 4-105 and CJ section 5-518 do not apply, the verdict

should be remitted to $166,000, because the verdict for over $90 million dollars shocked the

conscience of the court.  The appellants argue that a remittitur only may be granted on a

motion for new trial, not on a motion for JNOV, and therefore the court's ruling was legally

incorrect.  We agree with the appellants.

Maryland law is well-established that upon a finding that a verdict is excessive, so as

to shock the conscience of the court, the court may order a new trial, "unless the plaintiff will

agree to accept a lesser sum fixed by the court."  *Banguera v. Taylor*, 312 Md. 609, 624

(1988).  Thus, a verdict only may be remitted in conjunction with a motion for new trial,

when the court has decided to grant the motion on the ground that the verdict is excessive but the plaintiff chooses to accept a remittitur instead.

Here, the Board asked the court to remit the verdict because it was excessive, but did so in the absence of a motion for new trial. As discussed above, Maryland law favors treating a motion or pleading in accordance with its substance, not its form. In the Board's JNOV motion, it makes no mention of a new trial. We cannot read the Board's request to the court to remit the verdict as a motion for new trial. (Nor did the court read it as such, as it did not consider granting a new trial.) Accordingly, the trial court erred in ruling that, if its JNOV on liability were reversed, and if EA section 4-105 and CJ section 5-518 do not apply, the verdict would be remitted to $166,000.

### (C)

Finally, appellants contend the court erred in ruling that any verdict in their favor must be reduced by the $20,000 paid to them in settlement of their claim against the driver who struck Ashley. There was no dispute that in the release memorializing that settlement the driver denied liability and denied joint tortfeasor status. In that circumstance, the only avenue for the Board to receive a reduction of any verdict against it based on the settlement paid is if the driver is proven liable for negligence, and therefore is a joint tortfeasor.

The appellants argue that the reduction was legally incorrect because the Board "failed to file a cross claim against the [driver] and further failed to prove up, in any fashion before the jury that [she] was a tortfeasor. Accordingly, under *Swigert v. Welk*[, 213 Md. 613

29

(1957)], and its progeny, the [Board is] not entitled to a credit, pro tanto, pro rata or otherwise." We agree.

"A release by the injured person of one joint tort-feasor . . . reduces the claim against the other tort-feasors. . . ." CJ § 3-1404. However, "when one claiming no liability obtains a release for himself from the injured party, the liability of others is not affected." *Loh v. Safeway Stores, Inc.*, 47 Md. App. 110, 127 (1980) (citing *Swigert*, 213 Md. at 619).

The appellants and the driver of the car signed a release in which the appellants agreed to dismiss their claims against the driver with prejudice in exchange for $20,000. It is undisputed that the release was made "without any admission of liability" on the part of the driver, who "denied that she is a joint tortfeasor." Therefore, absent a finding by the jury of liability on the part of the driver, which would make her a joint tortfeasor, the Board was not entitled to any reduction of the verdict based on the settlement. As there was no such finding of liability, the court erred in ruling that any verdict would be reduced by the $20,000 paid by the driver (or by any amount relating to that settlement).

**JUDGMENT NOTWITHSTANDING THE VERDICT REVERSED AS TO LIABILITY; VERDICT IN FAVOR OF THE APPELLANTS ON LIABILITY REINSTATED. JUDGMENT VACATED AS TO DAMAGES. CASE REMANDED FOR FURTHER PROCEEDINGS ON DAMAGES IN ACCORDANCE WITH THE VIEWS EXPRESSED IN THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.**